1   JOSEPH P. RUSSONIELLO (CSBN 44332)
    United States Attorney
2   JOANN M. SWANSON (CSBN 88143)
    Chief, Civil Division
3   CLAIRE T. CORMIER (CSBN 154364)
    Assistant United States Attorney
4        150 Almaden Blvd., Suite 900
         San Jose, California 95113
5        Telephone: (408) 535-5082
         FAX: (408) 535-5081
6        claire.cormier@usdoj.gov

7   Attorneys for United States of America

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  KATHLEEN VENTIMIGLIA,                )    No. 07-05481 RS
    individually, and as the Guardian Ad Litem )
12  for STEPHEN VENTIMILIA and KELLIE    )
    VENTIMILIA,                          )
13                                       )    DEFENDANT'S NOTICE OF MOTION
                                         )    AND MOTION TO DISMISS FOR LACK
14              Plaintiffs,              )    OF SUBJECT MATTER JURISDICTION
                                         )    (FRCP 12(b)(1))
15          v.                           )
                                         )    Date:  August 27, 2008
16  UNITED STATES OF AMERICA,            )    Time: 9:30 a.m.
    CHAMBLIN-LANDES                      )    Courtroom 4 , 5th Floor
17  CONSTRUCTION, INC., a California     )    Hon. Richard G. Seeborg
    corporation, and DOES 1-50, inclusive, )
18                                       )
                Defendants              )
19  _____   )

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NOTICE OF MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ISSUES TO BE DETERMINED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Accident on November 29, 2005. . . . . . . . . . . . . . . . . . . . . 2

    B. The Monterey Pines Golf Course and Alpha Lake. . . . . . . . . . . . 4

    C. The Navy's Social, Economic, and Political Policy
        Reasons Behind Its Golf Course Design Decisions. . . . . . . . . . . . 5

IV. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. The Standard For 12(b)(1) Motions. . . . . . . . . . . . . . . . . . . . . . . . 11

    B. The Discretionary Function Exception. . . . . . . . . . . . . . . . . . . . . 13

        1. The Element of Discretion. . . . . . . . . . . . . . . . . . . . . . . . . 14

        2. The Element of Policy Judgment. . . . . . . . . . . . . . . . . . . . 17

V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

-i-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987)............................ 20

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).................................................. 11

*Association of American Medical Colleges v. U.S.*, 217 F.3d 770
(9th Cir. 2000)............................................................................... 12

*Bell Atlantic Corp. v. Twombley*, __ U.S. __, 127 S. Ct. 1955 (2007). ......................... 12

*Berkovitz v. United States*, 486 U.S. 531 (1991). ................. 13, 15, 17, 18, 19, 20, 21, 22

*Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996)............................. 17, 19, 20

*Calif. ex. rel. Younger v. Andrus*, 608 F.2d 1247 (9th Cir.1979) .................................. 12

*Chaffin v United States*, 176 F.3d 1208 (9th Cir. 1999). ............................................... 18

*Childers v. United States*, 40 F.3d 973 (9th Cir. 1994). ......................................... 16, 20

*Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996).................................................. 12

*GATX/Airlog Co. v. United States*, 286 F.3d 1168 (9th Cir. 2002). ......................... 13, 14

*Inlandboatmens Union of the Pac. v. Dutra Group*, 279 F.3d 1075
(9th Cir. 2002).............................................................................. 12

*Kennewick Irrigation District v. United States*, 880 F.2d 1018
(9th Cir. 1989).................................................................... 14, 17, 18

*La Reunion Francaise SA v. Barnes*, 247 F.3d 1022 (9th Cir. 2000). ............................ 12

*LeSoeur v. United States*, 21 F.3d 965 (9th Cir. 1994).................................................. 14

*Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001). ................. 15, 16

*Miller v. United States*, 163 F.3d 591 (9th Cir. 1998). .................................................. 17

*Navarette v. United States*, 500 F.3d 914 (9th Cir. 2007). ............................................ 21

*Oberson v. United States*, 514 F.3d 989 (9th Cir. 2008). .............................................. 21

*Papasan v. Allain*, 478 U.S. 265 (1986). ...................................................................... 12

*Prescott v. United States*, 973 F.2d 696 (9th Cir.1992)................................................. 12

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2005)..................................... 12
*Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006). .................................. 13, 14, 20

*St. Clair v. City of Chico*, 880 F.2d 199 (9th Cir. 1989)................................................. 12

-ii-

*Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221 (9th Cir. 1989). ...................... 12

*Terbush v. United States*, 516 F.3d 1125 (9th Cir. 2008). ........................... 12, 17, 18, 21

*Thornhill Publ. Co. v. Gen'l Telegraph & Electronics Corp.*, 594 F.2d 730
(9th Cir. 1979). ......................................................................................................... 12

*United States ex rel Newsham v. Lockheed Missiles & Space Co.*, 190
F.3d 963 (9th Cir. 1999), *cert. denied*, 530 U.S. 1203 (2000). ...................................... 12

*United States v. Gaubert*, 499 U.S. 315 (1991). ................................................. 13, 17, 18

*United States v. Mitchell*, 445 U.S. 535 (1980). ............................................................ 13

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense
(Varig Airlines)*, 467 U.S. 797 (1984). .......................................................................... 13

*United States v. Sherwood*, 312 U.S. 584 (1941). ........................................................... 13

*Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995). ................................................. 20

*Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005). ........................................... 18

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000). ................................................................. 12

## FEDERAL STATUTES

28 U.S.C. §1346. ........................................................................................................... 13

28 U.S.C. § 2680(a). ...................................................................................................... 13

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 1, 11, 12

Fed. R. Civ. P. 12(h)(3). ................................................................................................ 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 27, 2008 at 9:30 a.m. in Courtroom 4, United States Federal Court House, 280 S. First St., San Jose, California, before the Honorable Richard G. Seeborg, U.S. Magistrate Judge, defendant United States of America will move this Court for an order dismissing plaintiff's claims for lack of subject matter jurisdiction. This motion is made pursuant to Fed. R. Civ. P. 12(b)(1) and Civil L.R. 7-2. The motion is based on this Notice, the attached Memorandum of Points and Authorities, the Declarations of David L. Ranson ("Ranson Decl."), Daniel R. Tracy ("Tracy Decl."), Claire T. Cormier ("Cormier Decl.")[1] and John A. Shea ("Shea Decl."), and the exhibits to those declarations, all the matters filed with the Court, and such other evidence as may be submitted and considered by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The discretionary function exception to the Federal Tort Claims Act deprives this Court of subject matter jurisdiction over plaintiff Kathleen Ventimiglia's[2] claim that the United States Department of the Navy ("Navy") was negligent in its failure to include specific safety precautions within or around an irrigation lake on the Monterey Pines Golf Course ("MPGC"), thereby proximately and actually causing the death of Joseph Ventimiglia. The discretionary function exception provides that the federal government's waiver of sovereign immunity does not apply to claims based on federal decisions that involve an exercise of discretion and involve policy judgment.

---

[1] Excerpts from the depositions of David Ranson and Daniel Tracy are attached to the Cormier Declaration as Exhibit A and Exhibit B, respectively, and are referred to herein as "Ranson Depo." and "Tracy Depo." They are authenticated in paragraphs three and four, respectively, of the Cormier Declaration. Exhibits to the Tracy Depo. are referred to by the numbers they were assigned at the deposition.

[2] Kathleen Ventimiglia is plaintiff in her own right, as well as in the capacity of guardian ad litem for each of her two minor children. Complaint For Damages ("Complaint")

NOTICE OF MOTION AND MOTION TO DISMISS
Case No. C 06-00911 PVT          -1-

1       The Navy has the discretion to design its golf courses, identify priorities and goals to

2  govern the allocation of resources, and foster a playing environment most likely to attract

3  golfers and generate revenue. The Navy exercised its broad discretion to design the lake in

4  question, factoring in such considerations as course aesthetics, water conservation, and efficient

5  expenditure of non-appropriated economic resources. In choosing to address safety concerns by

6  placing warning signs around the lake, the Navy made a choice susceptible to policy-based

7  analysis, as other courses of action would undercut aesthetic, environmental, and economic

8  goals.

9

10  **II.     ISSUES TO BE DETERMINED**

11       1.  The discretionary function exception is an exception to the Federal Tort Claims Act's

12  waiver of sovereign immunity for negligence claims based on decisions by federal employees or

13  agents involving an exercise of discretion and policy judgment.  The Navy had discretion to

14  design golf courses, considering factors such as course aesthetics, water conservation, safety,

15  and economic efficiency.  Does the discretionary function exception deprive this Court of

16  subject matter jurisdiction over the Navy's decisions about design and construction of MPGC?

17       2.  The Navy had the discretion to choose the means by which to protect golfers from

18  the hazards of MPGC's Alpha Lake.   Does the discretionary function exception deprive this

19  Court of subject matter jurisdiction over the Navy's decision to address these safety concerns by

20  placing warning signs around the lake, rather than taking the specific precautions suggested by

21  the plaintiff?

22

23  **III.    STATEMENT OF FACTS**

24       **A.     The Accident on November 29, 2005**

25       To the extent that they are known, the facts of the subject accident are largely

26  undisputed.  At approximately 1:00 P.M. on November 29, 2005, decedent Joseph Ventimiglia,

27  52 years old and a retired Department of Defense civilian employee, checked in at the MPGC

28  pro shop to begin a round of golf.  Complaint ¶¶13 and 14; Shea Decl. ¶ 5, Exh. A (USN00108

NOTICE OF MOTION AND MOTION TO DISMISS

1    ¶ 2).  MPGC employees reported that the decedent usually golfed by himself and hit multiple

2    balls per hole.  Shea Decl. ¶ 5, Exh. A (USN00108 ¶ 3).  Later in the afternoon, a couple

3    reported an unattended golf bag near hole 3 (close to the southwest corner of Alpha Lake) to the

4    pro shop attendant, who retrieved the bag and stored it in a maintenance garage.  Shea Decl. ¶ 5,

5    Exh. A (USN00111 ¶¶ 3-5, USN00117 ¶¶ 3-4).  When the decedent failed to return home that

6    evening, his wife filed a missing person report with the Seaside Police Department.  Shea Decl.

7    ¶ 6, Exh. B (USN00082).

8        Early the next morning, MPGC employees identified the decedent's  vehicle in the

9    facility's parking lot.  Shea Decl. ¶ 5, Exh. A (USN00110 ¶¶ 1-2).  MPGC General Manager

10   David Stockley contacted the Naval Postgraduate School Police Department (NPSPD), and

11   investigators soon arrived.  Id. ¶¶ 1-3.  After reviewing the known facts and discovering drag

12   marks on an exposed section of Alpha Lake's black plastic liner, NPSPD investigators ordered

13   the area secured.  Id. ¶¶ 3-4. A second search of the premises was negative, and investigators

14   then requested a dive rescue response team to search Alpha Lake.  Id. ¶ 4.  Robert Hornady, a

15   diver with Pacific Grove Ocean Rescue, discovered a fully clothed body approximately 8 feet

16   below the surface of the Alpha Lake, which was retrieved and identified as Mr. Ventimiglia's

17   body. Shea Decl. ¶¶ 5-6, Exh. A (USN00116 ¶¶ 1-2), Exh. B. (USN00084 ¶¶ 4-5).

18       A post mortem examination found that asphyxiation due to accidental drowning was the

19   cause of death.  Shea Decl. ¶ 6, Exh. B (USN00067, USN00072).  No drugs or alcohol were

20   found in the decedent's body, and no significant abnormalities or signs of trauma were

21   identified.  Shea Decl. ¶ 6, Exh. B (USN00067-USN00073).  Michael Ventimiglia, the

22   decedent's brother, suspected that the decedent had fallen into Alpha Lake while trying to

23   retrieve a golf ball, noting that the his brother was known to retrieve balls in such a manner, in

24   spite of his very poor swimming skills.  Shea Decl. ¶¶ 5-6, Exh. A (USN00061 section titled

25   "Executive Summary, and USN00063 ¶ 3), Exh. B (USN00066 ¶ 3).  The eventual discovery of

26   a 3-iron golf club at the bottom of the lake corroborated Michael Ventimiglia's theory; course

27

28

1   officials opined that the decedent had used this club, the longest type, with a flat-angled head,

2   to retrieve a ball.[3]   Shea Decl. ¶ 5, Exh. A (USN00117 ¶ 7).

3       **B.      The Monterey Pines Golf Course and Alpha Lake**

4       The Monterey Pines Golf Course (MPGC) consists of an 18-hole course, a golf

5   clubhouse, and a number of maintenance support structures.  Ranson Decl. ¶ 6.  It is one of

6   approximately thirty-six nine-, eighteen-, and twenty-seven-hole golf courses owned and

7   operated by the U.S. Navy as part of its Morale, Welfare and Recreation (MWR) program.

8   Ranson Decl. ¶¶ 2, 6.  These courses serve to provide recreation to uniformed Navy personnel

9   and affiliated civilian employees and their families, and to generate revenue to fund other MWR

10  programs.  Ranson Decl. ¶¶ 2, 3.  MPGC was built in 1963, and is located on the premises of the

11  Naval Postgraduate School in Monterey, California.  Ranson Decl. ¶ 6.  While minor

12  improvements had been made, the course generally followed the architecture of the original

13  build-out plan at the time of the subject incident.[4]  Ranson Decl. ¶7.

14      Alpha Lake was located directly to the northeast of hole three and to the northwest of the

15  hole four tee boxes.  Ranson Decl. ¶ 15, Exh. 4 (p. 27 of Irrigation System Upgrade: Feasibility

16  Study).  The Lake served primarily as a source for irrigation, and secondarily as a course

17  obstacle to enhance gameplay and improve course aesthetics.  Tracy Depo. 12:5-16.  It was

18  approximately 460 feet in circumference, with a width of 85 feet at its widest and a length of 204

19  feet at its longest.  Tracy Depo. 32:22, Exh. 3 ("MPGC Hole 3 Pond" diagram).  The bottom of

20  the lake was approximately 12 to 14 feet from the surface.  *Id.*  In 2001, Alpha Lake was fitted

21  with a black plastic liner, which functioned to prevent water loss through seepage into the soil.

22  Ranson Depo., 23:14-24:8; Tracy Depo., 15:2-11, 20:19-21:5.  The rim of the liner was exposed

23  above the surface of the water around the entire circumference of the lake, leaving a plastic

25  [3]Supporting the course officials' conclusion was the professional opinion that a golfer in
26  Mr. Ventimiglia's hitting position (approximately 80 yards from the hole, according to the
    placement of the golf bag) would not otherwise have used a three-iron, which is normally
27  reserved for shots of approximately 200 yards.  Shea Decl. ¶ 5, Exh. A (USN00117 ¶ 7).

28  [4]MPGC is currently undergoing a major renovation, which includes the replacement of
    Alpha Lake with a superior irrigation source.  Tracy Depo. 50:10-25; Ranson Decl. ¶7.

1  margin between the water and the turf.  Tracy Depo. 48:22-49:19; Tracy Decl. ¶ 4, Exh. A and
2  B.  A floating fountain was situated in the center of the lake, supported by ropes connected to the
3  north and south banks.  Tracy Depo. 28:6-30:5, 32:17-34:4, Exh. 1, 3.

4       Approximately six clearly-marked warning signs[5] were placed around Alpha Lake to
5  deter golfers such as Mr. Ventimiglia from entering the water, specifically forbidding retrieval of
6  balls.  Tracy Depo. 46:18-23; Tracy Decl.¶ 3, Exh. A.  Prior to Mr. Ventimiglia's death, no
7  golfer had ever drowned in Alpha Lake[6], and the Course Superintendent had not been aware of
8  any golfers accidentally falling into the lake.[7]  Ranson Decl. ¶ 9; Tracy Decl. ¶ 3.

9
    **C.    The Navy's Social, Economic, and Political Policy Reasons Behind Its Golf
10           Course Design Decisions**

11      The Navy's golf program is a component of its Morale, Welfare and Recreation Division
12  (MWR), which administers a varied program of recreational, social and community support
13  activities on U.S. Navy facilities worldwide.  Ranson Decl. ¶ 2.  The golf program seeks to
14  provide recreational opportunities for, and to promote and enhance the physical well-being of,
15  Navy personnel and their families.  Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C §
16  2201).[8] More specifically, the program's mission includes promoting esprit de corps and morale
17  of military patrons through the sport of golf, balancing customer-driven programs and the
18  requirement to meet financial goals, and providing quality golf facilities and programs to satisfy

19
20      [5] The text of the signs read as follows: "<u>DANGER</u>: PLEASE STAY OUT OF THE
21  LAKE. <u>NO</u> RETRIEVAL OF GOLF BALLS."  Tracy Depo. 47:4-18; Tracy Decl.¶ 3, Exh. A.

22      [6] Officials reported that, to the best of their knowledge, no preventable death of the nature
    of Mr. Ventimiglia's had ever occurred on any Navy golf course prior to subject incident as
23  specified within the rules of golf (as distinguished from deaths unrelated to the rules of golf, such
24  as heart attacks on a golf course).  Ranson Decl. ¶ 9.

25      [7] In the summer of 2004, one golfer was reported to have fallen into Alpha Lake and was
    helped out by other golfers.  Shea Decl. ¶ 5, Exh. A (USN00119 ¶ 2).  This incident was not
26  reported to the MPGC superintendent until after Mr. Ventimiglia's death.  Tracy Depo. 35:13-
27  37:15.

28      [8] These instructions have the legal effect of agency regulations.  Ranson Decl. ¶ 2.

NOTICE OF MOTION AND MOTION TO DISMISS
Case No. C 06-00911 PVT                  -5-

1    the needs of all golfers regardless of skill level.  Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction

2    1710.11C §§ 2202(a),(b),(c)). The program ultimately contributes to the MWR division's

3    broader mission directives, which include (among others) improving sailor retention and

4    readiness.[9]

5           The Bureau of Naval Personnel's (BUPERS) guidelines govern the administration of the

6    MWR program, and its sections pertaining to golf course design encompass a significant set of

7    social, economic and political policy considerations. As a Category C MWR activity, the golf

8    program exhibits a high capacity to generate  revenue through the sale of goods and services.

9    Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C § 409(c)).  As such, it is sustained

10   entirely by nonappropriated funds (NAF)– that is, profits derived from Category C programs and

11   the Navy's other revenue-generating business activities.  Ranson Decl. ¶¶ 2, 3.  The BUPERS

12   Instruction requires that Category C activities generate profits for the general NAF pool, and

13   mandate a 10% minimum profit margin for golf course activities.  Ranson Decl. ¶ 2, Exh. A

14   (BUPERS Instruction 1710.11C § 2802(4)(a)).  These profits help support non-revenue-

15   generating MWR activities, including (but not limited to) youth centers, skills development

16   centers (which include auto, hobby and recreational components), and recreational pools.

17   Ranson Decl. ¶ 3.  To meet this level of profitability, golf course managers are instructed to

18   provide "services that compare to the best public golf courses in the United States... [and]

19   emphasize course sizing and playing conditions to stimulate increased activity and customer

20   satisfaction." Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C §§ 2802(4)(c),(d)).

21          Thus, in designing and maintaining its golf courses, the Navy must consider both social

22   factors (in providing a recreational environment that best contributes to the retention, readiness,

23   mental, physical, and emotional well-being of Navy personnel), as well as economic factors (in

24   maximizing profits to contribute to the NAF pool and thereby fund and enhance other MWR

25   activities).

26

27   ───────────────────

28          [9] Some of the language from this paragraph derives from the homepage of the MWR
     Division's website, available at http://www.mwr.navy.mil/.

1    These considerations also operate at a political level. On April 17, 2008, John Baker,

2    Director of the Navy Installation Command's Fleet and Family Readiness Program, testified

3    before the House Armed Services Committee - Subcommittee on Military Personnel. In his

4    prepared statement before the subcommittee, Mr. Baker addressed the state of the MWR

5    program, including the

6      declining activity at a number of Navy nine-hole golf courses. The average
       number of rounds dropped to all-time lows of less than 3,000 with corresponding
7      reductions in cash flow. A few of the reasons for reduced play include
       substandard playing conditions. . . and increased competition in certain parts of
8      the country.  In FY2007, four nine-hole golf courses. . . were closed due to
       reduced play and subsequent lack of profitability.
9

10   Cormier Decl. ¶ 5, Exh. C (Statement of Mr. John Baker before the House Armed Services

11   Committee Subcommittee on Military Personnel, April 17, 2008, p. 7, ¶ 1).  Furthermore, in its

12   1st Quadrennial Quality of Life Review Report to Congress (May 2004), the Department of

13   Defense included statistics tracking military-wide satisfaction with golf courses, as well as

14   frequency of golf course use among Army personnel.  Ranson Decl. ¶ 13, Exh. C (Department of

15   Defense Report of the 1st Quadrennial Quality of Life Review, p. 151, 157).  Thus, the need for

16   satisfactory golf courses in generating revenue for other programs and enhancing the quality of

17   life of Navy and other military personnel is an issue with clear and defined political

18   ramifications.

19        The design of Alpha Lake related directly to the Navy's political, social and economic

20   imperative to operate MPGC according to the Navy's policies and standards. As the MWR's

21   Golf Operating Guidelines and Financial Standards note, an attractive, well-maintained facility

22   and grounds is crucial to a successful golf course operation, and "a high quality product is much

23   easier to market than one of poor quality...the determining factor for customer satisfaction... is

24   the quality and amount of turf coverage, how manicured the entire area is, and the way the grass

25   is mowed." Ranson Decl. ¶ 13, Exh. D (Golf Operating Guidelines and Financial Standards,

26   section titled  "Effective Marketing of a Golf Program," paragraph titled "Quality Product").

27   Alpha Lake functioned primarily as an irrigation source to sustain the quality of turf around the

28   course.  Tracy Depo. 12:5-16.  The plastic membrane that lined Alpha Lake was necessary to

1   avoid loss of water by seepage into the soil, which had previously been a persistent problem at

2   MPGC.  Ranson Depo. 23:14-24:8; Tracy Depo. 15:2-11, 20:19-21:5.  Not only is water the

3   most significant cost element in operating a golf course, but its preservation is also a significant

4   environmental (and thus socio-political) issue in California, where water is in critically short

5   supply.[10]  Ranson Decl. ¶ 7; Tracy Decl. ¶ 4.  The grading, volume and depth of Alpha Lake

6   allowed the Navy to store a greater amount of irrigable water than it could have otherwise,

7   allowing it to more fully comply with its mandate to maintain healthy grass and terrain on the

8   course.    Ranson Decl. ¶ 10; Tracy Decl. ¶ 4.

9           Additionally, the Navy's decision to protect golfers from Alpha Lake's hazards by

10  placing warning signs around the lake is susceptible to policy-based analysis.  From a standpoint

11  of economic efficiency, the utilization of warning signs  (as opposed to plaintiff's suggestion of

12  terraced stepping areas) would maximize financial resources by providing effective deterrence at

13  a relatively low cost.  Complaint ¶ 21; Ranson Decl. ¶¶ 10-12.[11]  The installation of terraced

14  stepping areas (also known as safety shelves) would require costly landscaping and re-grading of

15  the terrain in and around the water feature.  Ranson Decl. ¶ 10.  For an individual lake or pond, it

16  is estimated that this redesign would cost between $125,000 and $225,000.  *Id.*  Additionally,

17  one must consider the wider implications of this choice as applied to the Navy MWR golf

---

18

19          [10] California's water shortage has grown so critical that the Association of California
20  Water Agencies has launched a public campaign to educate residents on the nature of the crisis
    and the rapidly increasing need for conservation (*see*  http://www.calwatercrisis.org).  The Navy
21  works closely with state and local authorities to ensure that it has proper authority to sustain the
    availability of this commodity.  Ranson Decl. ¶ 7.  Water conservation thus continues to be a
22  politically, socially and economically salient issue in the state, and the Federal government
23  should have broad leeway in designing its golf courses in order to address this problem
    effectively.

24

25          [11]  The presence of grab-ropes or safety buoys in the water may not have prevented
    subject incident. A rope did exist in the lake to anchor the fountain at the center of the lake, and
26  iceplants growing at water level at certain points around the lake could have provided a means of
    escape from the lake.  *See* Tracy Decl. ¶ 6, Exh. A and B; Tracy Depo. 27:19-30:7 and Exh. 1.  If
27  Mr. Ventimiglia was unable to extricate himself from the lake given these features, it is unlikely
    that grab-ropes or safety buoys would have been more effective.
28

1   program as a whole (and, indeed, to all military golf courses).  If the Navy were required to

2   install safety shelves in every water feature at all thirty-six MWR golf courses,[12] the economic

3   burden would be significant: a Navy official estimates that the costs of such a project would

4   range from $25 to 40 million. *Id.*  This figure could increase by a factor of two to three

5   depending upon the impact on other golf course features, including monetary losses resulting

6   from lakes' and ponds' diminished capacity to store irrigation as well as impacts to cart paths,

7   bridges, hole alignments, irrigation and pump systems.  *Id.*  At most Navy courses, the additional

8   land needed to preserve the water capacity for irrigation and possibly alter course configuration

9   is not available.  *Id.*

10          These facts and estimations are especially salient in light of the Navy's requirement that

11  Category C MWR activities such as golf generate a profit while at the same time  "provid[ing] a

12  reasonable discount from comparable off-base MWR facilities/programs."  Ranson Decl. ¶ 2,

13  Exh. A (BUPERS Instruction 1710.11C §§ 411, 411(a)).  The BUPERS Instructions specifically

14  denote that the Navy's golf program must "increase revenues to ensure that recapitalization

15  needs are consistently met."  Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C §§

16  2802(4)(f)).  The only way that an MWR course such as MPGC might comply with such a

17  mandate is by using its discretion to identify investment priorities and avoid needless

18  expenditure. The time estimated for the Navy Golf Program to generate the necessary funding

19  for installation of safety shelves could approach ten to fifteen years, seriously cutting into

20  proceeds normally allocated to help fund other MWR activities.  Ranson Decl. ¶ 10.  Such a

21  project would therefore significantly undermine the Navy's ability to achieve its goal of

22  profitability. Warning signs, by contrast, pose little or no obstacle such a goal, incurring less

23  than 1% (approximately) of the total costs associated with safety shelves: MPGC officials

24  reported that they spent about $700 to place warning signs around Alpha Lake. Tracy Decl. ¶ 3;

25  Ranson Decl. ¶ 10.  The choice to address golfer safety by erecting warning signs thus involved

26  a key calculus grounded on economic policy considerations.

27

28          [12] A Navy official estimates that each course has an average of three-to-five water features
    per course.  Ranson Decl. ¶ 10.

1    Each of the other safety precautions cited in the complaint – fences, guard rails, grab-

2    ropes, and safety buoys – entail inherent drawbacks that render warning signs the preferred

3    safety precaution to prevent accidents in golf course water features.  While each of the

4    aforementioned features would likely be more expensive than warning signs (by an estimated

5    factor of 1.5 to 2.5), their primary disadvantages relate to course visuals, safety and speed of

6    play.  Ranson Decl. ¶ 11; Tracy Decl. ¶ 5.  These devices would negatively impact course

7    aesthetics and conflict with the desired balance with the natural terrain, resulting in a cluttered

8    environment, and diminishing the general golfing experience for course patrons.  Ranson Decl. ¶

9    11; Tracy Decl. ¶ 5.  The MWR's Golf Operating Guidelines and Financial Standards identifies

10   physical attractiveness as a "major characteristic[] of a well run golf facility," and emphasizes

11   that MWR courses "must be brought up to competitive standards of other facilities in the area."

12   Ranson Decl. ¶ 13, Exh. D (Golf Operating Guidelines and Financial Standards, sections titled

13   "Major Characteristics of well run Golf Facilities" and  "Effective Marketing of a Golf Program"

14   and paragraph titled "Quality Product").  This echoes the BUPERS Instructions' requirements

15   that MWR courses attain a level of quality comparable to the "best public golf courses in the

16   United States." Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C §§ 2802(4)(c)).

17   Water safety features such as fences, guard rails, grab ropes and safety buoys are rarely, if ever,

18   seen in lakes and ponds at U.S. golf courses, as they detract significantly from the physical

19   attractiveness of a course and create disjuncture between the water features and the overall

20   course design.  Ranson Decl. ¶ 12; Tracy Decl. ¶ 5.  In choosing a less visually obstructive

21   means by which to protect golfers from water dangers, the Navy acted on its social and

22   economic agenda to offer personnel more physically attractive playing conditions and rendering

23   the course and its services more "competitive with the local market."  Tracy Decl. ¶ 5; Ranson

24   Decl. ¶ 2, Exh. A( BUPERS Instruction 1710.11C, Appendix K(a)(2)).[13]

25

26        [13] The MWR's Golf Course Planning Principles suggests that course designers "visually

27   integrate existing and new water features within the overall design scheme [of the course],"
     underscoring the aesthetic significance of water features to the course's general environment.

28   Ranson Decl. ¶ 8, Exh. B (Golf Course Planning Principles, section titled "Lakes and Ponds").

Perhaps most importantly, guard-rails, fences, safety buoys or grab-ropes could serve as attractive nuisances and convey the impression to golfers that reclamation of balls was contemplated by course officials and therefore acceptable.  Ranson Decl. ¶ 11; Tracy Decl. ¶ 5. On the contrary, the Navy seeks to discourage golfers as much as possible from approaching and retrieving balls from water features.  Ranson Decl. ¶ 11.  Not only does such retrieval endanger the safety of golfers, it can slow down game play and result in course congestion.  Ranson Decl. ¶ 11; Tracy Decl. ¶ 5.  This could ultimately drive golfers away from Navy courses, rendering it less competitive with other local courses (in contravention of the BUPERS Instruction) and further diminish program revenue. Ranson Decl. ¶¶ 2 and 11, Exh. A (BUPERS Instruction 1710.11C, Appendix K(a)(2)).  The Navy considers the most effective safety features to be not those that are costly or obtrusive, but those which clearly and visibly convey course rules and utilize plain language to direct golfers away from water features. Ranson Decl. ¶ 12; Tracy Decl. ¶ 5.  To this end, warning signs are an appropriate mode of protecting golfers from potentially dangerous water features, offering effective accident deterrence at an affordable cost without diminishing course aesthetics or inadvertently encouraging golfers to enter the water.[14]  Ranson Decl. ¶ 12.

## IV.   ARGUMENT

### A.    The Standard For 12(b)(1) Motions

An objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in litigation.  Fed. R. Civ. P. 12(b)(1); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  Rule 12(h)(3) instructs that a court should dismiss any action over which it lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(h)(3); *Arbaugh*, 546 U.S. at 506.

A Rule 12(b)(1) motion can either facially attack the sufficiency of the pleadings to establish federal jurisdiction or factually attack the substance of the jurisdictional allegations.

---

[14] Warning signs also have the advantage of being visible from many different angles. Tracy Decl. ¶ 5.

1  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2005) (citing *White v. Lee*, 227

2  F.3d 1214, 1242 (9th Cir. 2000)).  In this motion, the United States challenges the Court's

3  subject matter jurisdiction over plaintiff's claim on factual grounds; accordingly, the applicable

4  standard of review differs greatly from that governing a ruling on a motion for summary

5  judgment.  *Thornhill Publ. Co. v. Gen'l Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.

6  1979).  While the Court must  presume the truthfulness of plaintiff's factual allegations, it need

7  not "accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v.*

8  *Twombley*, __ U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265,

9  286 (1986)).  Additionally, the Court is presumed to lack subject matter jurisdiction until

10  plaintiff proves otherwise. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th

11  Cir. 1989); *Calif. ex. rel. Younger v. Andrus*, 608 F.2d 1247, 1249 (9th Cir. 1979).  However,

12  while the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA,

13  the United States bears the ultimate burden of proving the applicability of the discretionary

14  function exception.  *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008); *Prescott v.*

15  *United States,* 973 F.2d 696, 702 (9th Cir.1992).

16      A District Court can hear evidence to resolve factual disputes, if necessary, to determine

17  whether jurisdiction exists.  *Inlandboatmens Union of the Pac. v. Dutra Group*, 279 F.3d 1075,

18  1083 (9th Cir. 2002).  "The district court obviously does not abuse its discretion by looking to

19  this extra pleading material in deciding the issue [of subject matter jurisdiction] even if it

20  becomes necessary to resolve factual disputes." *St. Clair v. City of Chico*, 880 F.2d 199, 201

21  (9th Cir. 1989).  On appeal to a higher court, a District Court's findings of fact must be accepted

22  unless clearly erroneous.  *See, e.g.*, *Ass'n of Am. Medical Colleges v. U.S.*, 217 F.3d 770, 778

23  (9th Cir. 2000); *La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1204 (9th Cir. 2000);

24  *United States ex rel Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 968 (9th Cir.

25  1999), *cert. denied*, 530 U.S. 1203 (2000).  Thus, it is error to treat a Rule 12(b)(1) motion as

26  one for summary judgment, or apply summary judgment standards.  *Dreier v. United States*, 106

27  F.3d 844, 847 (9th Cir. 1996).

28

1

### B.    The Discretionary Function Exception

2    "The United States, as sovereign, is immune from suit save as it consents to be sued . . .

3    and the terms of its consent to be sued in any court define that court's jurisdiction to entertain

4    the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v.*

5    *Sherwood*, 312 U.S. 584, 586 (1941). The Federal Tort Claims Act ("FTCA") waives the

6    sovereign immunity of the United States for certain torts committed by government employees

7    where a claim would exist under state law if the government were a private party. 28 U.S.C. §

8    1346.

9    However, the discretionary function exception of the FTCA is the first of several

10    statutory exceptions that limit the federal government's waiver of sovereign immunity. 28

11    U.S.C. § 2680(a). The discretionary function exception states that a plaintiff may not bring a

12    tort claim "based upon the exercise or performance or the failure to exercise or perform a

13    discretionary function or duty on the part of a federal agency or an employee of the Government,

14    whether or not the discretion involved be abused." *Id.* The purpose of this exception is to

15    "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in

16    social, economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991)

17    (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467

18    U.S. 797, 814 (1984)).

19    In *Berkovitz v. United States*, 486 U.S. 531, 536-537 (1991), the Supreme Court

20    developed a two-part test to determine whether the discretionary function exception bars a

21    particular tort claim. First, the challenged conduct must involve an element of judgment or

22    choice on the part of the government actor. *Id.; GATX/Airlog Co. v. United States*, 286 F.3d

23    1168, 1173-74 (9th Cir. 2002). The conduct is not discretionary if "a federal statute, regulation,

24    or policy specifically prescribes a course of action for [a federal] employee to follow." *Soldano*

25    *v. United States*, 453 F.3d 1140, 1145 (9th Cir. 2006), quoting *Berkovitz,* 486 U.S. at 536.

26    Second, the challenged conduct must be based on social, economic, or political policy

27    considerations. *Soldano*, 453 F.3d at 1145. With respect to the second prong of the test, "[t]he

28    focus is on the 'nature of the actions taken and on whether they are susceptible to policy

1   analysis.' . . . The decision 'need not *actually* be grounded in policy considerations' so long as it

2   is, 'by its nature, susceptible to a policy analysis.'" *GATX*, 286 F.3d at 1174 (emphasis in

3   original)(citations omitted)  "The exception will apply if the discretionary decision made is a

4   permissible exercise of policy judgment, even if the decision is an abuse of the discretion

5   granted." *Soldano*, 453 F.3d at 1145 (internal quotations and citations omitted).  If the federal

6   defendant meets the burden of proving that the discretionary function exception applies, then

7   federal courts lack subject matter jurisdiction to hear the plaintiff's claim. *GATX*, 286 F.3d at

8   1174; *LeSoeur v. United States*, 21 F.3d 965, 967 (9th Cir. 1994). Additionally, the Ninth Circuit

9   has held that a negligence inquiry is separate from, and irrelevant to, a determination of the

10  discretionary function exception's applicability. *Kennewick Irrigation Dist. v. United States*, 880

11  F.2d 1018, 1029 (9th Cir. 1989).

12      Plaintiff alleges that the Navy was negligent in the design of Alpha Lake because it failed

13  to provide "necessary precautions to prevent golfers from accidentally falling into the [lake] by,

14  among other things, placing a guard rail and/or fencing around said pond." Complaint ¶ 19.

15  Plaintiff also alleges that the depth and grading of the lake and the nature of the plastic liner

16  necessitated "terraced stepping areas. . ., a rope, or similar devices. . . to assist golfers who had

17  fallen into the [lake]," and the Navy's failure to provide such precautions constituted negligence.

18  Complaint ¶¶ 20-21.  These claims are barred by the discretionary function exception because

19  the Navy's design of Alpha Lake and the decision to install warning signs instead of plaintiff's

20  demanded  protective devices involved elements of both discretion and policy judgment.

21                      **1.    The Element of Discretion**

22      The Navy's decisions regarding the design of Alpha Lake, including its choice to line the

23  lake with a plastic water-retaining membrane were discretionary because the Navy was bound by

24  no mandated course of action. The same is true for the Navy's decision to place warning signs

25  around the lake: because no statute, regulation or policy directive prescribed a particular set of

26  precautions to protect golfers from golf course water hazards, the Navy had the discretion to

27  address golfer safety as it best saw fit.  Ranson Decl. ¶ 12.  A discretionary function is one

28  involving "an element of judgment or choice," and a challenged action is not considered

1    discretionary if a "federal statute, regulation, or policy specifically prescribes a course of action

2    for an employee to follow." *Berkovitz,* 486 U.S. at 536.  Conversely, if the conduct involves

3    choice or judgment rather than adherence to a mandatory directive, as did the Navy's choices at

4    issue here, then the activities are discretionary.  As such, "discretion may be either affirmatively

5    conferred or tacitly implied." *Marlys Bear Medicine v. United States,* 241 F.3d 1208, 1213 (9th

6    Cir. 2001)(*citing Gaubert*, 499 U.S. at 324).

7         The Bureau of Navy Personnel provides policy and operational standards for the

8    administration of the MWR program through BUPERS Instruction 1710.11C.  Chapter 22

9    (§§2201 to 2211) of this Instruction pertains to the Navy Golf Program, as does Appendix K

10   ("Successful Golf Program Check List").  Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction

11   1710.11C §§ 2201-2211, and Appendix K).  Neither Chapter 22 nor Appendix K include any

12   prescriptions relating to lake design or golfer safety vis-a-vis water features on Navy golf

13   courses.  *Id.*  Chapter 22 specifically grants wide discretion to local administrators in managing

14   their courses: "Golf course operations. . . [require]  a level of entrepreneurial expertise found in

15   similar private and municipal golf course operations.  Navy golf course operations should be

16   organized within the local MWR program where business activity expertise can be optimized."

17   Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C § 2203(a)). While §§2203(e) and (g)

18   instructs course managers to "follow commonly accepted practices" and "industry training

19   guides and publications" for guidance on program development and management, MWR

20   officials were unable (after conducting a survey) to identify any United States Golf Association

21   specifications relating to underwater slope design for golf course water features, and they report

22   that placement of safety buoys, fences, guard rails, or grab ropes are not part of commonly

23

24

25

26

27

28

accepted practices or prescribed in industry guideline materials.[15]  Ranson Decl. ¶¶ 8, 12; Tracy Decl. ¶ 5.

The BUPERS Instruction's independent section regarding safety establishes particular requirements for some activities (such as ceramics, hunting, photography, woodworking, and equestrian activities) but makes no specific reference to the Navy Golf Program at all.  Ranson Decl. ¶ 2, Exh. A (BUPERS Instruction 1710.11C § 322).  The section's MWR-wide requirements (introductory text and subsections (a), (b) and (c)) are very broad in scope (e.g., "an aggressive safety program will be in effect for MWR activities") and cannot be construed to require the Navy to take the specific safety precautions demanded by plaintiff.  *Id.* "A general statutory duty to promote safety. . . would not be sufficient to meet the *Berkovitz* requirement for specific regulations setting out a clear duty." *Marlys Bear Medicine,* 241 F.3d at 1215 (internal quotations omitted).  That §322 provides specific requirements for some MWR activities but makes no reference to golf strongly suggests that the Instruction's drafters intended to give golf course managers wide discretion in operating their individual facilities, including the discretion to address safety concerns in the manner they deem most effective.

The BUPERS Instruction therefore permits local golf course administrators to "exercise judgment and choice about what sorts of facilities and safety features. . . to provide." *See Childers v. United States*, 40 F.3d 973, 974 (9th Cir. 1994)(internal quotations omitted).  The Instruction outlines broad policy goals involving "aggressive safety program[s]" for all MWR

---

[15] The same is true of the MWR's internal Golf Operating Guidelines and Financial Standards, which makes no reference to particular safety features or practices, and specifically notes that "these guidelines may be adapted to local conditions," provided that the "major characteristics. . . apply."  Ranson Decl. ¶ 13, Exh. D (Golf Operating Guildeines and Financial Standards, introductory text).  The MWR's Golf Course Planning Principles do reference safety, but primarily with regards to protecting golfers from "errant shots;" no reference is made to water hazard safety. Ranson Decl. ¶ 8, Exh. B (Golf Course Planning Principles, section titled "General Planning").  Grading and slope ratios are cited, but only in reference to above-ground areas.  *Id.* Finally, these planning principles are "intended to be a design guidance tool from lessons learned to assist [course designers] in [the] planning process;" as such, it is inherently discretionary, and cannot be considered to have the force of statute, regulation, or agency guidelines.  Ranson Decl. ¶ 8, Exh. B (Golf Course Planning Principles, introductory text).

1   programs (*see* §322), but "does not set out the specific means by which the [golf program]

2   employees are to meet these general goals." *See Blackburn v. United States*, 100 F.3d 1426,

3   1431 (9th Cir. 1996).  Where guidelines and regulations set out general goals and policies

4   without providing specific plans or mandates, they "necessarily involve an element of discretion

5   in determining the precise manner in which to meet these goals." *Blackburn*, 100 F.3d at 1433.

6   The Instruction specifically directs course administrators to "balance customer-driven programs

7   and the requirement to meet financial goals."  Ranson Decl. ¶2, Exh. A (BUPERS Instruction

8   1710.11C §§2202(b)).  Ninth Circuit case law clearly holds that the balancing of different

9   priorities, as well as decisions governing the allocation of resources, are discretionary choices

10  protected by § 2680(a).  *Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998).  Thus, the

11  Navy's decisions to design and utilize Alpha Lake as it did and to address concerns of golfer

12  safety through warning signs were discretionary choices, fulfilling the first prong of *Berkovitz's*

13  two-step test.

14                          **2.    The Element of Policy Judgment**

15          The discretionary function exception protects "government actions and decisions based

16  on considerations of public policy." *Berkovitz*,  486 U.S. at 536-537. In *Gaubert*, the Supreme

17  Court was very clear in holding that government decisions that satisfy the *Berkovitz's* first prong

18  are assumed to satisfy its second prong as well:

19                  When established government policy. . . allows a Government agent to
                    exercise discretion, it must be presumed that the agent's acts are grounded
20                  in policy when exercising that discretion. For a complaint to survive a
                    motion to dismiss, it must allege facts which would support a finding that
21                  the challenged actions are not the kind of conduct that can be said to be
                    grounded in the policy of the regulatory regime.
22

23  *Gaubert*, 499 U.S. at 324-325.  Additionally, "the relevant question is not whether an explicit

24  balancing is *proved*, but whether the decision is *susceptible* to policy analysis."  *Kennewick*, 880

25  F.2d at 1028 (emphasis added); *see also Terbush v. United States*, 516 F.3d 1125, 11334 (9th

26  Cir. 2007)("[W]e do not need actual evidence of policy-weighing in any given decision. . .").

27  The Supreme Court has also specified that the discretionary function exception depends on "the

28  nature of the conduct, rather than the status of the actor," *Berkovitz*,  486 U.S. at 536 (internal

1    quotations omitted); accordingly, the Ninth Circuit has determined that an inquiry into the

2    exception's applicability "does not depend on whether the relevant decision was made by an

3    individual at the 'operational' or 'planning' level." *Whisnant v. United States*, 400 F.3d 1177,

4    1181 (9th Cir. 2005), *citing Gaubert*, 499 U.S. at 325-26.

5        Thus, for the discretionary function exception to apply in this case, it does not matter if

6    the specific design and safety decisions relating to Alpha Lake were made by upper level

7    managers or operational level personnel, or even whether or not the Navy actually weighed

8    policy factors. The relevant fact is that the Navy's choices regarding Alpha Lake are susceptible

9    to social, political and economic policy considerations; thus, the second prong of the *Berkovitz*

10   test is satisfied, and the government is immune from suit.

11       Plaintiff's claim focuses on the Navy's failure to design Alpha Lake in a particular

12   manner that might have prevented her husband's death, as well as its failure to design a system

13   of safety precautions above and beyond the placement of clear warning signs. Because plaintiff

14   focuses solely on design, rather than implementation, she attacks a policy-based decision of the

15   Navy that is immune from suit under the discretionary function exception. "Our case law

16   teaches. . . that design matters involve discretionary decisions by government actors." *Terbush*,

17   516 F.3d at 1131; *see also Whisnant*, 400 F.3d at 1181("[W]e have generally held that the

18   *design* of a course of government action is shielded by the discretionary function exception,

19   whereas the *implementation* of that course of action is not.") (emphasis in original); *Chaffin v*

20   *United States* 176 F.3d 1208, 1211 (9th Cir. 1999) (holding that the discretionary function

21   exception barred suit against the government for having designed living quarters in a manner

22   that rendered them accessible by wild animals); *Kennewick*, 880 F.2d at 1029 (holding that the

23   discretionary function exception protected the government against suit for having designed a

24   canal with certain vulnerable materials).  Because plaintiff challenges only the design of Alpha

25   Lake, rather than a failure to maintain it according to predefined standards, her suit is barred

26   under Supreme Court and Ninth Circuit precedent.  *See* Complaint ¶¶ 19-21.

27       Even if the Circuit's case law did not shield all design decisions *per se*, the discretionary

28   function exception would still apply, because (as discussed in Section C of the Statement of

1   Facts) many policy considerations factored into Alpha Lake's design and utilization: these

2   include economic efficiency, MPGC's mandate to generate revenue to help fund other MWR

3   activities, water conservation, course aesthetics, and political requirements to operate low-

4   priced, attractive and well-irrigated environments in order to compete with other local courses.

5   Of course, the Navy also considered golfer safety as an important factor in its decisionmaking. In

6   determining that warning signs provided the optimum balance between golfer safety and other

7   considerations and priorities, the Navy utilized its discretion to make a policy-based judgment.

8   Thus, the Navy's conduct fell squarely within *Berkovitz's* second prong. Plaintiff may disagree

9   with the way in which the Navy balanced these competing considerations, but the Federal Tort

10  Claims Act does not allow her to bring suit based on her disagreement.

11        Ninth Circuit case law provides an abundance of analogous situations in which the court

12  ruled in favor of the discretionary function exception's applicability. Most directly on point is

13  *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996). In that case, plaintiff challenged the

14  National Park Service's (NPS) decision to place general warning signs upon a bridge at

15  Yosemite National Park, rather than redesign the bridge and watercourse below it, or provide

16  more specific warnings. *Id.* at 1428-29. The court ruled that NPS had the discretion "to balance,

17  within the constraints of the resources available to them, a statutory mandate to provide access

18  with the goal of public safety. This decision was precisely the kind the discretionary function

19  exception was intended to immunize from suit." *Id.* at 1434. The court further noted that

20        the NPS must balance the goal of public safety against competing fiscal
          concerns as well as the danger of an overproliferation of warnings. . . .
21        The signs were intended to educate the public as to the hazard while at the
          same time not unduly inhibit visitor enjoyment of the area or endanger the
22        riparian environment.

23  *Id.*

24        The facts in the case at bar are strikingly similar: the warning signs around Alpha Lake

25  were installed in order to protect golfers from the hazards of the water while at the same time not

26  diminishing golfer enjoyment of course aesthetics (as safety buoys, fences, guard rails, or grab

27  ropes would), inhibiting water conservation (as the lack of a plastic liner would), restraining

28  irrigation (as a less steep slope and less deep lake would), or undercutting economic efficiency

1   (as all of the alternative safety precautions would). In balancing safety concerns against

2   countervailing policy considerations, the Navy made a decision that was no less "the kind the

3   discretionary function exception was intended to immunize from suit" than that made by the

4   NPS in *Blackburn*. *Id.* at 1434 (internal quotations omitted).

5      Several other Ninth Circuit cases provide useful analogs indicating that the Navy's

6   conduct met the second prong of the *Berkovitz* test. In *Childers*, plaintiffs challenged the NPS's

7   decision to warn park visitors of winter trail hazards through brochures, visitor center displays

8   and bulletin board notices, rather than targeted warning signs.  40 F.3d at 974, 976. The court

9   found that this decision "inherently require[d] a balancing of public policy objectives, such as

10  resource allocation, visitor safety and visitor access." *Id.* at 974-975 (internal quotations

11  omitted). Accordingly, the court determined that the discretionary function exception barred

12  plaintiffs from suing the NPS for choosing a particular set of safety precautions over a number of

13  more rigorous options.

14     Similarly, in *Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995), the court found that

15  the discretionary function exception protected the NPS's decision not to employ specific

16  precautionary measures (such as warning signs or guard rails)  to protect park visitors from a

17  potentially hazardous waterfall. The court observed that "the challenged conduct clearly

18  implicates a choice between the competing policy considerations of maximizing access to and

19  preservation of natural resources versus the need to minimize potential safety hazards." *Id*. at

20  1180. *See also ARA Leisure Servs. v. United States*, 831 F.2d 193, 195-96 (9th Cir. 1987)

21  (holding that the discretionary function exception protected the NPS's decision not to install

22  guard rails on a park road, but not improper maintenance of the road); *Soldano v. United States*,

23  453 F.3d at 1147 (holding that the discretionary function exception immunized from suit the

24  NPS's decision not to include a warning sign on a park road).[16]

25

26  _____

27  [16] In *Soldano*, the court also held that the discretionary function exception did not protect
    the NPS's decision to set the road's speed limit at 35 miles per hour, since that limit violated the
28  NPS's own internal guidelines known as the *Park Road Standards*, and thus failed to satisfy the
    first prong of the *Berkovitz* test. *Soldano*, 453 F.3d 1148-1149.

1    The Ninth Circuit recently summarized this particular body of law in *Terbush v. United*

2    *States*: "Most of our cases in the post-*Gaubert* era have held that fulfilling the NPS's decision to

3    warn the public of hazards in the national parks entails the kind of policy weighing decision

4    protected from judicial review by the discretionary function exception." *Terbush*, 516 F.3d at

5    1135. The Navy's decision to protect golfers from water hazards and the NPS's decision to

6    protect the public from dangers at national parks entail many of the same policy considerations:

7    allocation of financial resources, preservation of natural resources, aesthetic considerations, and

8    visitor enjoyment. Furthermore, in many of the national park cases, plaintiffs challenged the

9    NPS's failure to post warning signs; in this case, the Navy *did* post warning signs, and plaintiff

10   challenges its decision not to install even more rigorous safety precautions. If the discretionary

11   function exception protected NPS officials' decision to adopt *less* rigorous precautions than

12   warning signs, then it should surely protect the Navy's choice *to* adopt warning signs, rather than

13   even more rigorous precautions.

14   The Ninth Circuit has ruled in some instances that the discretionary function exception

15   did not protect government decisions not to adopt certain precautionary measures.  However, all

16   of these cases involve a failure to satisfy one of the two prongs of the *Berkovitz* test, and can

17   thus be distinguished from the case at bar. In one group of cases, the court found that the

18   government's activities failed to comply with a mandatory, pre-established course of action, and

19   thus failed to fulfill *Berkovitz's* first prong (*see, e.g., Navarette v. United States*, 500 F.3d 914,

20   916-17 (9th Cir. 2007)). In a second group of cases, the court found that the government's

21   activities were not susceptible to policy-based considerations, and thus failed to satisfy

22   *Berkovitz's* second prong (*see, e.g., Oberson v. United States*, 514 F.3d 989, 997-998 (9th Cir.

23   2008)). In the present case, the Navy had the discretion to design Alpha Lake and protect golfers

24   from its hazards according to its own best judgment. Additionally, in utilizing its discretion, the

25   Navy balanced a number of significant policy-based considerations, as discussed above. Thus,

26   the Navy's decisions regarding Alpha Lake satisfy both prongs of the *Berkovitz* test, and are

27   protected by the discretionary function exception.

28

1    **V.      CONCLUSION**

2         The U.S. Department of the Navy had the discretion to design Alpha Lake according to

3    its own specifications, and to choose the manner in which to protect golfers from injuring

4    themselves in the water. Furthermore, a number of policy-based considerations governed the

5    Navy's decisionmaking process. Thus, according to the Supreme Court's two-pronged inquiry in

6    *Berkovitz v. United States*, the government's waiver of sovereign immunity does not apply, and

7    the discretionary function exception of the Federal Tort Claims Acts bars plaintiff's claims

8    against the United States.  The Court should therefore grant defendant's motion to dismiss for

9    lack of subject matter jurisdiction and dismiss plaintiff's complaint against the United States in

10   its entirety and with prejudice.

11                                              Respectfully submitted,

12        DATED: July 18 , 2008              JOSEPH P. RUSSONIELLO
                                             United States Attorney

13                                           /s/ Claire T. Cormier

14                                           _____

15                                           CLAIRE T. CORMIER
                                             Assistant United States Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28