1   JOSEPH P. RUSSONIELLO (CSBN 44332)
    United States Attorney
2   JOANN M. SWANSON (CSBN 88143)
    Chief, Civil Division
3   CLAIRE T. CORMIER (CSBN 154364)
    Assistant United States Attorney
4       150 Almaden Blvd., Suite 900
        San Jose, California 95113
5       Telephone: (408) 535-5082
        FAX: (408) 535-5081
6       claire.cormier@usdoj.gov

7   Attorneys for United States of America

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11

12  KATHLEEN VENTIMIGLIA,                  )    No. 07-05481 RS
    individually, and as the Guardian Ad Litem )
13  for STEPHEN VENTIMILIA and KELLIE      )
    VENTIMILIA,                            )
14                                         )    **DECLARATION OF CLAIRE T.**
                                           )    **CORMIER IN SUPPORT OF**
15             Plaintiffs,                 )    **DEFENDANT UNITED STATES OF**
                                           )    **AMERICA'S MOTION TO DISMISS**
16        v.                               )
                                           )
17  UNITED STATES OF AMERICA,              )
    CHAMBLIN-LANDES                        )
18  CONSTRUCTION, INC., a California       )
    corporation, and DOES 1-50, inclusive, )
19                                         )
               Defendants                  )
20  _____ )

21        I, Claire T. Cormier, declare as follows:

22        1. I am an attorney in good standing with the bar of this Court. I represent defendant

23  United States of America in this action. This declaration is made in support of defendant's

24  Motion to Dismiss, filed herewith.

25        2. The matters stated in this declaration are true of my own knowledge and, if

26  necessary, I could and would competently testify to them.

27        3. Attached hereto as Exhibit A are true and correct copies of excerpts of the deposition

28  of David Ranson.

CORMIER DECLARATION RE MOTION TO DISMISS
Case No. 07-05481 RS

1     4. Attached hereto as Exhibit B are true and correct copies of excerpts of the deposition

2 of Daniel Tracy. Attached hereto as Exhibits 1, 2, 3, and 4 are true and correct copies of the

3 exhibits marked with those numbers during Mr. Tracy's deposition, except that color

4 documents from the deposition are attached hereto in black and white, and Exhibit 4 has been

5 reduced in size.

6     5. Attached hereto as Exhibit C is a true and correct copy of the statement of Mr. John

7 Baker before the House Armed Service Committee, Subcommittee on Military Personnel, April

8 17, 2008, as obtained from the House of Representatives web site at

9 http://www.house.gov/hasc/hearing_information.shtml, more specifically at

10 http://armedservices.house.gov/pdfs/MP041708/Baker_Testimony041708.pdf. The House of

11 Representatives web site identifies Mr. Baker as Fleet and Family Readiness Program Director

12 for the Navy Installations Command.

13     I declare under penalty of perjury that the foregoing is true and correct.

14     Executed on July 17, 2008, at San Jose, California.

15

16                 /s/ Claire T. Cormier

17                 Claire T. Cormier

18

19

20

21

22

23

24

25

26

27

28

CORMIER DECLARATION RE MOTION TO DISMISS
Case No. 07-05481 RS         1

Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KATHLEEN VENTIMIGLIA,          )
individually, and as the       )
Guardian Ad Litem for STEPHEN  )
VENTIMILIA and KELLIE          )
VENTIMILIA,                    )
                               )          **CERTIFIED COPY**
              Plaintiffs,      )
                               )
    vs.                        )   CASE NO. CO7 05481 RS
                               )
UNITED STATES OF AMERICA,      )
CHAMBLIN-LANDES DESIGN, INC.,  )
a California corporation,      )
et al.,                        )
                               )
              Defendants.      )
_____ )

DEPOSITION OF DAVID LYNN RANSON

DATE:            June 3, 2003

TIME:            10:02 a.m.

LOCATION:        CORSIGLIA McMAHON & ALLARD LLP
                 96 North Third Street
                 Suite 620
                 San Jose, CA  95112

REPORTED BY:     Jean H. Vaughn
                 Certified Shorthand Reporter
                 License Number C-4139

**DISK
ENCLOSED**



**PULONE & STROMBERG, INC.**
CERTIFIED SHORTHAND REPORTING
AND VIDEOCONFERENCING SERVICES
— Serving the Legal Community Since 1978 —

Offices in San Jose and Santa Cruz
Conference rooms throughout Northern California
1-800-200-1252
depos@pulone.com  •  www.pulone.com

1      Q.  -- with respect --

2      A.  And other agencies that are related to golf

3  course endeavors.

4      Q.  So when you look at a project primarily you are

5  looking at does it meet the goals of what we are trying

6  to accomplish?

7      A.  Yes, sir.

8      Q.  For instance, say, a certain volume --

9      A.  Yes.

10      Q.  -- criteria?

11      A.  Yes, sir.

12      Q.  And whether or not structurally -- whether it

13  can be built safely or soundly you defer that to

14  others --

15      A.  That's correct.

16      Q.  -- who are contracting with the Navy?

17      A.  That's correct.

18      Q.  And then you look at the budget aspects --

19      A.  Uh-huh.

20      Q.  -- of the project?

21      A.  And then we also have respective people from

22  the Navy facility engineering command who are assigned

23  to that region, from environmental, from safety, from

24  fire protection, from all the whole myriad of

25  disciplines who are also -- we ask them to sit in on

22

1    those plan reviews and so forth and we give them to them

2    to also review as an adjunct to what we are doing.

3         Q.  So in this case with respect to the Alpha Lake

4    that was renovated in 2001, 2002, say, did you look at

5    any plans for the renovation?

6         A.  No, in that what I was -- outlined to me was --

7    well, other than the plans and so forth that went with

8    the type of the liner, went with how it would be

9    installed, what they were recommending and so forth from

10   that standpoint.  And our construction agency provided

11   that information to us to -- so we are aware of what

12   they are proposing.  Then we give a copy to the command

13   so that their folks can review it also.

14        Q.  What was your understanding as to why the

15   superintendent wanted the Alpha Lake renovated in 2001?

16        A.  The loss of water.

17        Q.  So he wanted to reduce or stop the loss of

18   water?

19        A.  That is exactly right.

20        Q.  Were there any other considerations that you

21   were aware of at that time?

22        A.  Yes, in that there's an economic consideration,

23   a very strong one, in that we are now paying for the

24   water that we use to irrigate the courses when it's

25   coming from an outside source or acquiring it.  And they

                                                          23

PULONE & STROMBERG, INC. (408) 280-1252

1    do acquire potable water to augment the -- and refill

2    the -- recharge the reservoirs here.  And that is a

3    substantial economic impact to the operation of the

4    course.  And so the water being lost -- you have some

5    evaporation loss, naturally.  But then you also have a

6    lot of loss depending on that sandy soil and that's the

7    problem there.  They were losing a lot of water through

8    the lake itself.

9         Q.  So the more water you save the less your water

10   bill?

11        A.  That's right.  And then that has an economic

12   implication to the other programs because golf is one of

13   our primary revenue generators and it supports other

14   recreational programs we refer to as Community Support

15   Category B, for example, that spans the service support

16   that's being provided to -- for the spouses and

17   everybody else that's an authorized patron.

18        Q.  Was there an economic analysis done with

19   respect to how much water could be saved by adding a

20   liner in 2001?

21        A.  Dan Tracy would give you -- there was

22   information -- they did look at that in 2001.  I do not

23   have a copy of that -- those numbers with me or I never

24   saw that.

25        Q.  Is that something you would have seen however

                                                      24

1    when you approved this?

2        A.  We would have -- we would have at least had the

3    summary of that or information relative to how

4    significant that loss factor was.

5        Q.  What is that document or documents called?  If

6    I ask for it, what would I ask for?

7        A.  If we had anything, that would be a part of the

8    background information.  That would be part of the

9    project modification.

10       Q.  However, before you approved the added

11   resources to pay for the -- this add-on, if you will,

12   wouldn't you have wanted to know what are we going to

13   save by paying X number of dollars to add the liner?

14       A.  They would have had an indication of that

15   locally at the command, what it represented.

16       Q.  But you would have done kind of a cost benefit

17   analysis yourself?

18       A.  That's right.

19       Q.  In other words, if it cost twenty-five thousand

20   to put in the liner but you are only going to save

21   $10,000 that may influence your decision one way or the

22   other, right?

23       A.  In the long-term perspective on that.

24       Q.  Now, was this major renovation that is now

25   ongoing at the course in the works in 2001?

                                                    25

1

2

3

4  STATE OF CALIFORNIA        )
                             )   ss.
5  COUNTY OF SANTA CLARA      )

6

7          I, JEAN H. VAUGHN, a Certified Shorthand

8  Reporter in and for the State of California, hereby

9  certify that the witness in the foregoing deposition,

10                    DAVID LYNN RANSON,

11 was by me duly sworn to tell the truth, the whole truth

12 and nothing but the truth in the within-entitled cause,

13 and that the foregoing is a full, true and correct

14 transcript of the proceedings had at the taking of said

15 deposition, reported to the best of my ability and

16 transcribed under my direction.

17

18

19 Date _June  11_, 2008.              _Jean H. Vaughn_
20                                     CSR Number C-4139

21

22

23

24

25

                                                       118

PULONE & STROMBERG, INC. (408) 280-1252

Kathleen Ventimiglia v. United States of America, et al.
Civil Action No. C 07-5481 RS
Corrections to Deposition of David Ranson
June 3, 2008

1.

| Page/Line # | Change: | To: |
|---|---|---|
| 7-20 | 60 golf courses | 36 courses, included are ... |
| 13-15 | repose | purpose |
| 15-1 | | add word "involved" after "got" |
| 15-2 | | add comma after the word "had" |
| 15-10 | | change "something" To "someone," |
| 16-6 | | insert "Project" before "Manager" |
| 17-10 | | Capitalize "Quality and Life" |
| 17-17 | | Delete word "then" |
| 17-20 | Spelling of Lasiowski | "LABANOWSKI" |
| 22-24 | | add word "construction" after "of" |
| 22-25 | | Delete: " who are also " |
| 23-1 | | Delete: " and we give them to them " |
| 23-2 | | Delete: "to also review" |
| 23-6 | Delete: " was outbid to me was " | insert "reviewed" after "I" |
| 23-7 | Delete: " well, ... forth that " | |
| 23-13 | Replace " can review " with " could " | |
| 24-21 | Replace "there was" w/ "that" | |

6 July 08
Date

David Ranson

Kathleen Ventimiglia v. United States of America, et al.
Civil Action No. C 07-5481 RS
Corrections to Deposition of David Ranson
June 3, 2008

2.

| Page/Line # | Change: | To: |
|---|---|---|
| 24 – 24 | Replace "that" w/ "them" | |
| 27 – 6 | Delete words "ever" and "up" | |
| 31 – 15 | | *look at "the overall firms" |
| 34 – 3 | add "s" To architect | |
| 54 – 11 | After word "consulted" add " with someone " | |
| 56 – 7 | Insert "that" after | word "out" |
| 56 – 12 | Correct Command Name | "Navy Support Activity MidSouth" |
| 56 – 13 | Delete "Activity" | |
| 58 – 24 | Delete "NO" | Correct to say "Yes" |
| 60 – 2 | Capitalize "Facilities Section" | |
| 61 – 17 | Delete "of" | Insert "if we" after "sense" |
| 61 – 17 | Delete "we" | |
| 64 – 20 | | Insert "(water)" after "there" |
| 66 – 19 | Delete word before "lake" | |
| 67 – 13 | Delete word "our" | Insert after "is" "on our staff" |
| 67-18 | - | Insert "at" after "look" |
| 67-21 | | Insert " is " after "Munnell" |

6 July 08
Date

David Ranson

Kathleen Ventimiglia v. United States of America, et al.
Civil Action No. C 07-5481 RS
Corrections to Deposition of David Ranson
June 3, 2008

*3.*

| Page/Line # | Change: | To: |
|---|---|---|
| 68-24 | | Insert "design features" after "different" |
| 69 - 7 | | Insert "hole" after "one" |
| 83-13 | Delete "bring" | Insert "consult with" after "would" |
| 86-14 | Delete "gone out and done" Insert "preformed" after "have" |
| 87-13 | Delete "on" | Insert "in" after "it" |
| 90-14 | | Insert "to" after "was" |
| 94-10 | Delete word between "after" "course" and "for" |
| 94-23 | Insert "-" in "pre-existing" |
| 95-12 | Delete "make a" & change to "made the" |
| 95-14 | Delete "point" and replace with "file" |
| 96-5 | Delete "be" and insert "be" after "probably" |
| 98-4 | Delete word "even" |
| 103-16 | Replace "into" with "to" |
| 103-20 | Delete word before "participate" |
| 103-23 | Replace "but" with "visit" |
| 103-24 | Delete "and come out" |
| 104-5 | Replace "administration" with "administrative" |

6 July 08
Date

David Ranson

Kathleen Ventimiglia v. United States of America, et al.
Civil Action No. C 07-5481 RS
Corrections to Deposition of David Ranson
June 3, 2008

4.

Page/Line #   Change:                    To:

104-16   Replace " ~~Greg~~ " is Delete " and Greg "

107-17   Insert " went " after "we "

107-18   Replace " what ✱ to propose " with " what a "

109-9   After the word "No " insert in parens "(no other incidents).

110-19   After "something " add " of that range. "

112-10   Replace "that " with "alpha "

112-16   add after " award " and our Project Manager.

112-25   add new sentence " Charlie Lake will be lined. "

113-15   Insert " - " in "pre - existing "

114-9   add " 's " to "one "

114-10   Change sentence to read: " that put their
            architectural stamps on the proposals that "

116-12   Change "Yeah " to "Yes. "

6 July 08
Date

David Ranson

Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KATHLEEN VENTIMIGLIA,           )
individually, and as the        )
Guardian Ad Litem for STEPHEN   )
VENTIMILIA and KELLIE           )
VENTIMILIA,                     )
                                )
               Plaintiffs,      )
                                )
     vs.                        )  CASE NO. CO7 05481 RS
                                )
UNITED STATES OF AMERICA,       )
CHAMBLIN-LANDES DESIGN, INC.,   )
a California corporation,       )
et al.,                         )
                                )
               Defendants.      )
_____)

**CERTIFIED COPY**

DEPOSITION OF DANIEL ROBERT TRACY

DATE:            June 4, 2003

TIME:            10:05 a.m.

LOCATION:        CORSIGLIA McMAHON & ALLARD LLP
                 96 North Third Street
                 Suite 620
                 San Jose, CA   95112

REPORTED BY:     Jean H. Vaughn
                 Certified Shorthand Reporter
                 License Number C-4139

**DISK
ENCLOSED**



PULONE & STROMBERG, INC.
CERTIFIED SHORTHAND REPORTING
AND VIDEOCONFERENCING SERVICES
— Serving the Legal Community Since 1978 —

Offices in San Jose and Santa Cruz
Conference rooms throughout Northern California

1-800-200-1252

depos@pulone.com  •  www.pulone.com

1                    I N D E X  O F  E X H I B I T S

2     DEPOSITION              DESCRIPTION              PAGE
      EXHIBIT

3
             1      Photocopy of a color photograph .... 29
4
             2      Photocopy of a color photograph .... 30
5
             3      One-page drawing labeled "MPGC  .... 32
6                   Hole 3 Pond"

7            4      Photocopy of an aerial color  ...... 54
                    photograph
8
             5      One page listing rules and one  .... 55
9                   page a score card

10           6      Monterey Pines Golf Course,  ....... 69
                    Monterey, California, Retention
11                  Basin Design

12           7      Photocopy of a color photograph .... 81

13           8      Photocopy of a color photograph .... 81

14

15

16

17

18

19

20

21

22

23

24

25
                                                          4

DEPOSITION OF DANIEL ROBERT TRACY

1  hazard on a golf course prior to Monterey Pines?

2      A.  No.

3      Q.  Were you ever involved in any capacity in

4  lining a water hazard in a golf course setting prior to

5  Monterey Pines?

6      A.  No.

7      Q.  In approximately 2001 a renovation of the

8  clubhouse took place or at least started --

9      A.  Uh-huh.

10     Q.  -- correct?

11         Is that yes?

12     A.  Yes.

13     Q.  Okay.  What was your -- what were your

14  responsibilities, if any, with respect to that project?

15     A.  I really didn't have any responsibilities for

16  that project.

17     Q.  As I understand it, primarily that project was

18  to renovate the clubhouse.  Right?

19     A.  That's correct.

20     Q.  And as part of an add-on it was decided to line

21  the pond between the third and fourth hole; is that

22  correct?

23     A.  That's correct.

24     Q.  Which is -- we are now referring to that as the

25  Alpha Lake.  Is that your understanding?

                                                10

1      A.  Yes, that's my understanding.

2      Q.  And had you referred to that as the Alpha Lake

3  prior to 2001?

4      A.  That's always been Alpha Lake since I've been

5  there.

6      Q.  Prior to 2001 was there a lake there?

7      A.  Yes.

8      Q.  Was it a manmade lake?

9      A.  Yes.

10     Q.  Do you know when that lake was first built?

11     A.  No.

12     Q.  Do you know if the original golf course design

13  called for a lake in that area?

14     A.  I don't know.

15     Q.  Have you ever seen the original plans for the

16  golf course?

17     A.  Yes.

18     Q.  And I understand that golf course was built in

19  1963.

20     A.  '63 is when it was opened.

21     Q.  All right.  And obviously that's before your

22  time as superintendent.  But when you first started then

23  in -- just what year was it that you first started?

24     A.  1986.  Or '85.  I can't remember.

25     Q.  Let's call it '85, '86, then.

11

1          A.   Okay.

2          Q.   When you first started then was there a lake in

3     that location?

4          A.   Yes.

5          Q.   And did that -- what was the purpose for that

6     lake?

7          A.   It's for water storage for irrigation.

8          Q.   And so as far as you know since you've been

9     there, has it always been used as a water storage

10    facility or area?

11         A.   Yes.

12         Q.   And was it also used as a hazard for people

13    playing the game?

14         A.   It's -- I would say that it was water storage

15    was number one and then maybe aesthetics number two.  I

16    don't know.

17         Q.   Were you aware that from time to time golfers

18    would hit errant shots that would land in that water?

19         A.   Yes.

20         Q.   It was red-staked, correct?

21         A.   That's correct.

22         Q.   I know it was red-staked when Mr. Ventimiglia

23    was found --

24         A.   Uh-huh.

25         Q.   -- in November of 2005.

                                               12

1          As far as you know, was it always red-staked?

2      A.   Yes.

3      Q.   And what does a red stake mean?

4      A.   It's a golf term for a hazard.  So that if

5  you -- if you hit within the hazard you can hit your

6  ball out from a red-staked area.  If you can't, then

7  it's a one stroke penalty to move your ball out of the

8  hazard.

9      Q.   So with respect to the rules of golf, it was

10  your understanding that if a golfer happened to hit an

11  errant shot into a red-staked water hazard, one of the

12  options was to play the ball out of that hazard?

13      A.   Yes, you can.

14      Q.   In the year prior to the renovation of Alpha

15  Lake, would you from time to time see golfers playing

16  balls out of the lake?

17      A.   I never saw anybody playing the ball out of the

18  lake, no.

19      Q.   Did you see golfers trying to retrieve balls

20  out of the lake?

21      A.   Yes.

22      Q.   Do you play golf?

23      A.   Yes.

24      Q.   Did you ever retrieve a ball out of that lake

25  prior to 2001?

13

1      A.   I would say yes.

2      Q.   There was another lake on the property as well,

3  correct?

4      A.   Uh-huh.

5      Q.   Is that called Charlie Lake?

6      A.   That's Charlie Lake.

7      Q.   That's a bigger lake?

8      A.   Actually, it's about the same size.

9      Q.   Okay.  I know it's going to be bigger lake

10  based on the current design, correct?

11     A.   Yes, it is.

12     Q.   But prior to the renovation of Alpha Lake in

13  2001, 2002, those two bodies of water were about equal

14  size?

15     A.   About equal size.

16     Q.   And do you have an estimate of how much their

17  capacities -- the capacity was for each?

18     A.   About two acre feet of water.

19     Q.   Now, prior to 2001 was Alpha Lake lined?

20     A.   No.

21     Q.   Was Charlie Lake lined?

22     A.   Yes.

23     Q.   When was Charlie Lake lined?

24     A.   I don't remember what year that was.

25     Q.   Were you involved in that project?

14

1      A.   Yes, I was.

2      Q.   Who -- who, if you know, made the suggestion or

3  recommendation that Charlie Lake should be lined at some

4  point?

5      A.   That would have probably started with me.

6      Q.   And what was your thinking at the time that you

7  recommended that Charlie Lake be lined?

8      A.   The problem we had was the loss of water

9  through the bottom of the lake.  And we are -- water is

10  so critical out there, the amount of it, that we need to

11  save as much as we could.

12      Q.   I'm sorry, what year was it lined?

13      A.   I really don't remember what year Charlie Lake

14  was lined.

15      Q.   Can you give me an estimate how many years

16  prior to Alpha Lake it was lined?

17      A.   I'm guessing probably about three to five years

18  before.

19      Q.   To line Charlie Lake, then, the lake had to be

20  emptied, correct?

21      A.   That's correct.

22      Q.   And were you involved in -- let me backtrack.

23           Who actually did the work to line Charlie Lake?

24      A.   It was our golf course staff, the Seabee staff

25  and also Colorado Lining were all involved in that.

15

1    Q.   Colorado Lining?

2    A.   Colorado Lining.

3    Q.   Are they out of Colorado?

4    A.   That's correct.

5    Q.   It's amazing.

6         Were you involved in selecting Colorado Lining

7    as the company to come in to assist in lining Charlie

8    Lake?

9    A.   Yes, I was.

10   Q.   Did Colorado Lining, were they the contractor

11   for the job?

12   A.   Actually, they just supplied the liner and

13   the -- they sent a couple guys out to weld the seams and

14   the boots on.

15   Q.   Did -- was there any excavation work associated

16   with lining Charlie Lake?

17   A.   Yes, there was.

18   Q.   Who did the excavation work?

19   A.   It was done by golf course staff and Seabees.

20   Q.   Golf course meaning what?

21   A.   Myself, my assistant and a couple of greens

22   keepers.

23   Q.   Okay.  So it was an in-house job with respect

24   to doing the excavation work?

25   A.   Yes, it was.

16

1      Q.   Did you have civil engineering plans drawn up

2   for the project to line Charlie Lake?

3      A.   No.

4      Q.   Did the -- what was the depth of Charlie Lake

5   prior to putting in the liner?

6      A.   I would say between eight and nine feet.

7      Q.   And did that depth change once the liner was

8   put in?

9      A.   No.

10     Q.   Did the configuration of Charlie Lake change in

11  preparation for putting in the liner?

12     A.   No.

13     Q.   What was the slope -- the side slopes prior to

14  putting in the liner at Charlie Lake?

15     A.   Prior to I really don't know.

16     Q.   Was there any effort made to determine the

17  slope?

18     A.   No.

19     Q.   Did the Colorado Lining make any

20  recommendations as to what would be an appropriate

21  slope, side slopes for installing the liner?

22     A.   I don't remember.

23     Q.   Did you receive any written materials from

24  Colorado Lining with respect to installing the liner?

25  Not that you did it --

17

1        A.   Right.

2        Q.   -- but with respect to the liner.

3        A.   I'm trying to remember.  I don't remember.

4        Q.   Actually, who did install the liner?

5        A.   The Seabees and the golf course staff actually

6   laid the liner.  You just pull it out in a roll and lay

7   it in the lake.  And it comes in -- I think it was in

8   three pieces.  And then it's tucked in at the edge.  And

9   the company itself comes in and welds the seams together

10  and then the boots where the pipes come into the lake.

11       Q.   Seabees referring to what?

12       A.   The Navy Seabees.  They are the --

13            MR. EMERSON:   Construction.

14            THE WITNESS:   Construction, yeah, for the Navy.

15  BY MR. CORSIGLIA:

16       Q.   Did you actually have to use like earth moving

17  equipment in preparation for putting the liner in

18  Charlie Lake?

19       A.   Yes.

20       Q.   What kind of equipment?

21       A.   We used a backhoe.  I don't know if they

22  used -- it was a backhoe with a front loader on it.  I

23  don't remember if there was anything else or not.

24       Q.   Was that operated by the Seabees?

25       A.   Most of it.  Some by us.

                                              18

1          Q.   Do you recall any discussions with anyone from

2    Colorado Lining as to slope ratios?

3          A.   No, I don't.

4          Q.   Did you receive any material, written material

5    with respect to maintenance of the liner?

6          A.   I think I did, but I don't remember.

7          Q.   Would you have kept that information?

8          A.   There's a chance I did, yeah.

9          Q.   Where would you keep it?

10         A.   I don't know if I do or not because I -- I

11   can't remember.  I would have to look.

12         Q.   Okay.  Where would you look, though?

13         A.   I looked in my office, but I already looked for

14   stuff that I hadn't found yet.  So I'm just saying I

15   probably received something but I don't remember where

16   it would be or if we still have it.

17         Q.   Was it your understanding that the liner should

18   be covered with soil or other similar material to

19   preserve the integrity of the liner?

20         A.   No.

21         Q.   That was not your understanding?  Or do you

22   know one way or another?

23         A.   Ask that again.

24         Q.   Sure.  Did anyone from Seabee Lining -- excuse

25   me -- Colorado Lining mention to you either orally or in

                                                          19

1   writing that as far as the maintenance of the liner that

2   it should be covered with either soil or other similar

3   material to preserve the integrity of the liner?

4        A.   Not that I remember, no.

5        Q.   Do you know what the slope ratio of Charlie

6   Lake is -- well, was prior to this recent renovation?

7        A.   No, I don't.

8        Q.   Do you know the type of liner that was

9   installed, the specs on the liner?

10       A.   No, I don't remember.

11       Q.   When -- as I understand it, you were also

12  instrumental in Alpha Lake being lined.  Correct?

13       A.   That's correct.

14       Q.   As I understand it from a deposition yesterday

15  that it likely was based on your recommendation that the

16  project to line Alpha Lake became part of the

17  Chamblin-Landes job to renovate the clubhouse.  Correct?

18       A.   No.

19       Q.   Okay.  How did it come about that Alpha Lake

20  was lined?

21       A.   It had been my recommendation to my bosses that

22  we line the lake to preserve the water --

23       Q.   Uh-huh.

24       A.   -- in the lake.

25            How it got to that contract, I really don't

                                                          20

DEPOSITION OF DANIEL ROBERT TRACY

1  know.

2      Q.  Oh, I see.  Okay.  When did you first make the

3  recommendation?

4      A.  Forever.  I've always recommended that.  Yes.

5  So any time we had lakes I wanted them lined.

6      Q.  In the other places you worked did you have

7  lakes or ponds with liners?

8      A.  No.

9      Q.  When did -- how did you first become familiar

10  with liners in lakes or ponds?

11      A.  I don't really remember.

12      Q.  Were you required to attend ongoing training

13  programs in your industry?

14      A.  Yes.

15      Q.  I mean would you go to conferences or

16  conventions?

17      A.  Yes.

18      Q.  And do you believe at one of those or some of

19  those that liners may have been discussed?

20      A.  It's possible.

21      Q.  Is it your practice to go like every year to a

22  certain convention or conference?

23      A.  At least every two to three years they try to

24  send us.

25      Q.  Is there one that you go to?

1      Q.  What was the depth of the lake before it was

2  lined?

3      A.  I'm guessing about nine feet.

4      Q.  Do you know what it was after -- in preparation

5  for being lined, do you know if that was changed any?

6      A.  Not that I'm aware of.

7      Q.  But you weren't involved in that decision, it

8  sounds like, if it was changed.  Is that correct?

9      A.  No, I wasn't.

10     Q.  As part of the lining of Alpha Lake do you know

11  if there was any intent to increase the water holding

12  capacity of the lake?

13     A.  No, not at the time, no, there wasn't.

14     Q.  So the sole purpose then was simply to line the

15  existing lake, correct?

16     A.  Correct.

17     Q.  And there was some excavation work done in

18  preparation for that, correct?

19     A.  That's correct.

20     Q.  Do you know what that consisted of?

21     A.  As far as I remember, it just consisted of

22  cleaning out the weeds and the debris from the lake and

23  making it smooth for the liner.

24     Q.  Prior to the lake being lined was it your

25  understanding that if someone happened to fall in the

26

PULONE & STROMBERG, INC.  (408) 280-1252

 1  lake that typically they would be able to get out of the

 2  lake?

 3              MS. CORMIER:  Objection.  Assumes facts not in

 4  evidence.

 5              You can answer.

 6              MR. EMERSON:  Also it calls for speculation.

 7              THE WITNESS:  Can you ask that again?

 8              MR. CORSIGLIA:  Sure, sure.

 9  BY MR. CORSIGLIA:

10       Q.  Prior to it being lined was it your

11  understanding if someone happened to fall in the lake

12  that they could typically get out of the lake?

13       A.  I can only speak for myself, but it wouldn't

14  have been a problem for me.

15       Q.  Did you see anything about the lake prior to it

16  being lined that would prevent someone from getting out

17  of the lake if they happened to fall into the lake?

18       A.  No.

19       Q.  Once it was lined, did you form an impression

20  that if someone were to fall in the lake that they may

21  or may not be able to get out of the lake?

22              MR. EMERSON:  Same objection.

23              THE WITNESS:  Again, my opinion was it would be

24  easy to get out of.

25  BY MR. CORSIGLIA:

                                                      27

1   Q. And what was that based on?

2   A. Based on myself if I fell in this lake there

3 was areas, ice plant to pull up, there was a rope across

4 the lake, it wasn't that steep that you couldn't get

5 out.

6   Q. Where was the rope across the lake located?

7   A. It was about the middle of the lake.

8   Q. And that's the photo -- I think we see you

9 pulling up the rope, right?

10   A. Yes, correct.

11   Q. And that rope appears to have been submerged in

12 the water.  Correct?

13   A. Correct.

14   Q. When was that rope put in there?

15   A. That rope was put in to hold the fountain

16 that's in the middle of the lake.  And it was put in

17 when the fountain was put in, and I don't remember at

18 what time we put that in.

19   Q. Was there a fountain in the lake?  Is there a

20 fountain -- well, it should be, at the time of this

21 incident was there a fountain in the lake?

22   A. Yes, there was.

23   Q. Was it right in the middle of the lake?

24   A. Yes.

25   Q. And did it work?  I mean, was it a functional

28

1  fountain?

2      A.   From time to time.

3      Q.   I'll mark Exhibit 1 to your deposition which is

4  a photo which I believe it depicts you holding up --

5      A.   Yes, that's correct.

6      Q.   Okay.

7           (WHEREUPON, DEPOSITION EXHIBIT 1 WAS MARKED FOR

8           IDENTIFICATION.)

9  BY MR. CORSIGLIA:

10     Q.   So what exactly are you holding?

11     A.   I'm holding the rope that's actually connected

12 to the fountain in the middle of the lake.

13     Q.   And so it connects to the fountain and what?

14     A.   It connects to a pole on the side of the lake

15 and then the fountain and then a pole on the other side

16 of the lake, so the rope stretches completely across the

17 lake to hold the fountain in place.

18     Q.   And assuming you are not holding it up it would

19 be submerged in the water, correct?

20     A.   It would be basically floating on the top.

21     Q.   Was it floating on the top?

22     A.   Yes.

23     Q.   In other words, were there buoys on it?

24     A.   No, there was not.

25     Q.   Is it something that was obvious --

29

1       A.   Yes.

2       Q.   -- to someone just looking in the water?

3       A.   Yes.

4       Q.   And that's in the middle of the lake, you said?

5       A.   That's correct.

6       Q.   Is there a reason why buoys weren't put on it?

7       A.   Didn't need them.

8       Q.   Do you know where Mr. Ventimiglia was found in

9   the lake?

10      A.   Yes.

11      Q.   Okay.  I read various reports and whatnot.  It

12  sounds like he was found in the southwest corner of the

13  lake.  Is that correct?  Does that make sense to you?

14      A.   Yes, it does.

15           MR. CORSIGLIA:  All right.  And I'll mark

16  Exhibit 2, another photo.

17           (WHEREUPON, DEPOSITION EXHIBIT 2 WAS MARKED FOR

18           IDENTIFICATION.)

19  BY MR. CORSIGLIA:

20      Q.   Does Exhibit 2 reflect the area where it's

21  presumed Mr. Ventimiglia went into the lake?

22      A.   Yes, it does.

23      Q.   And can you just circle or put an X in the area

24  where you --

25      A.   About the area that I feel it was done?

30

1        Q.   Right.

2        A.   Right about there.

3             MR. EMERSON:   Excuse me.   Okay.

4   BY MR. CORSIGLIA:

5        Q.   All right.   That X is -- again, that would be

6   considered the southwest portion of the lake; is that

7   correct?

8        A.   That would be more of the north -- more west,

9   just west, I think more than anything else.

10       Q.   Okay.   And I'm pointing to a tree.   Is that a

11  pine tree?

12       A.   Yes, it is.

13       Q.   And do you know where his golf bag was found in

14  relationship to this photo?

15       A.   I don't know.   I just know where I was told.

16       Q.   Now, where are these lines that are depicted in

17  Exhibit 1 in relationship to where it's believed

18  Mr. Ventimiglia went into the lake?

19       A.   You mean the rope?

20       Q.   The ropes.

21       A.   It would be --

22       Q.   Would it be more center of the pond or lake?

23       A.   Yeah.

24       Q.   Okay.

25       A.   More in the center of the lake here.

31

1        Q.   Let me do this.

2             MR. EMERSON:   Can we hold up for just a second

3   so I can find my Exhibit 2 here so I don't have to be

4   looking over his shoulder?

5             MS. CORMIER:   I think that's it.

6             MR. EMERSON:   Okay.   Thank you.

7   BY MR. CORSIGLIA:

8        Q.   Were you involved in -- after Mr. Ventimiglia

9   was found, in doing any investigation about the

10  circumstances of him ending up in the lake?   Were you

11  involved in any part of the investigation after this

12  incident?

13       A.   Just about questions.

14       Q.   You were questioned by someone from the U.S.

15  Navy Criminal Investigation Service?

16       A.   Yes.

17            MR. CORSIGLIA:   I'm going to -- let me make a

18  copy of this and then I'm going to ask him to identify

19  where the rope is.

20            Let's go off the record.

21            (Brief recess taken.)

22            MR. CORSIGLIA:   We'll mark this Exhibit 3.

23            (WHEREUPON, DEPOSITION EXHIBIT 3 WAS MARKED FOR

24            IDENTIFICATION.)

25  BY MR. CORSIGLIA:

                                              32

1    Q.  I'll just represent -- this was provided to us

2    by the government and it's part of the government's

3    investigation of this incident.  It's a diagram of the

4    pond apparently where Mr. Ventimiglia was found.  But --

5    and on that diagram obviously there's some indicators as

6    to where his golf bag was found and where -- let me see.

7            Oh, "Approximate location of drag marks on

8    black plastic lining."  That's represented by Letter B.

9            By the way, did you see those marks?

10   A.   Yes, I did.

11   Q.   And when did you see them?

12   A.   I saw them the morning that we were looking for

13   him.

14   Q.   So that would have been November 30th?

15   A.   If that's the day, yeah.

16   Q.   All right.  And based on those markings I

17   assume is where you then on Exhibit 2 placed the

18   approximate location where you believe he went into the

19   water?

20   A.   Correct.

21   Q.   Now, what I would like you to do then on

22   Exhibit 3 is, could you mark for me approximately where

23   the ropes were located that you are holding in Exhibit

24   1.

25   A.   Here is where the fountain was in the middle.

33

1    Q.   Okay.

2         And he made a circle in the middle of the

3    diagram.

4    A.   Okay.

5    Q.   So it sounds like you had really no involvement

6    other than making the recommendation that Alpha Lake be

7    lined in the actual lining of Alpha Lake.  Correct?

8    A.   That's correct.

9    Q.   And you had no involvement in any retaining a

10   civil engineer to draw up plans for that part of the

11   project; is that correct?

12   A.   That's correct.

13   Q.   And you had had no involvement in selecting the

14   contractor who was retained to perform that task; is

15   that correct?

16   A.   That's correct.

17   Q.   And I understand that Larry Spencer, Inc., was

18   retained as a subcontractor of the contractor to assist

19   in lining the lake.  Were you aware of that?

20   A.   I was not.

21   Q.   And I assume, then, that you never attended a

22   meeting with anyone involved in lining Alpha Lake

23   wherein various issues were discussed about that

24   project.  Is that true?

25   A.   Not that I can recall.

34

1    Q.  Now, I'll show you -- I don't really need to

2  mark this.  You've seen it, I assume.  I'm showing you

3  what's, again, been provided to us by -- actually I

4  think Chamblin-Landes provided this to us, but this is a

5  drawing, civil engineering drawings from WWD

6  Corporation.

7        Are you familiar with that corporation?

8    A.  No, I'm not.

9    Q.  And it's entitled "The Monterey Pines Golf

10 Course Retention Basin Design."  And I'll ask you, prior

11 to today have you ever seen this document?

12   A.  No, I have not.

13   Q.  Prior to November 29th, 2005, which is the date

14 that's reflected when Mr. Ventimiglia likely fell into

15 the lake, did it come to your attention that anyone else

16 had fallen into that lake?

17   A.  After the fact it had.

18   Q.  So after the fact you learned that prior to

19 Mr. Ventimiglia falling into the lake you learned that

20 one or more people had fallen into that lake?

21   A.  That's what I heard, yes.

22   Q.  And who did you hear that from?

23   A.  That would have been from Rikki Panis.

24   Q.  Is that R-i-k-k-i?

25   A.  R-i-k-k-i.

35

DEPOSITION OF DANIEL ROBERT TRACY

1      Q.   And Rikki Panis was what?

2      A.   She worked in the golf shop.

3      Q.   Do you know what her title was?

4      A.   I'm trying to remember at the time.  She may

5   have been at that time the assistant manager.

6      Q.   Is she still there?

7      A.   No.

8      Q.   Do you know when she was last there?

9      A.   I don't remember when Rikki left.  It's been a

10   couple years.

11      Q.   Do you know how long she was there?

12      A.   She was there for, I'm guessing, seven, eight

13   years.  She was pretty young.  Maybe not.

14      Q.   Do you know where she is now?

15      A.   She still works at the Naval Postgraduate

16   School.

17      Q.   In what capacity, do you know?

18      A.   She's an assistant administrator to a dean or

19   somebody down there.

20      Q.   So what did Rikki Panis tell you about other

21   people falling into the lake before Mr. Ventimiglia

22   fell?

23      A.   Apparently her uncle had witnessed somebody

24   fall into the lake.

25      Q.   And did she tell you anything more about that?

                                                      36

DEPOSITION OF DANIEL ROBERT TRACY

```
 1        A.   Not that I recall.
 2        Q.   In other words, how he fell in, how he got out,
 3   did he need help getting out.  Things like that.
 4        A.   Not that I recall.
 5        Q.   Do you know her uncle?
 6        A.   No, I don't.
 7        Q.   Did you ever talk to her uncle?
 8        A.   No.
 9        Q.   Did you talk to anyone else who told you that
10   they were aware that someone else had fallen into the
11   lake before November 2005?
12        A.   No.
13        Q.   So after the fact you learned of one other
14   person who had fallen into the lake?
15        A.   Correct.
16        Q.   Okay.  Prior to the renovation to the clubhouse
17   in 2001, 2002, had you worked with Chamblin-Landes on
18   any other projects?
19        A.   Can you say that again?
20        Q.   Sure.  Prior to the renovation of -- to the
21   clubhouse in 2001, 2002, had you worked with
22   Chamblin-Landes on any other projects?
23        A.   No.
24        Q.   Did you know Joe Ventimiglia?
25        A.   Yes, I did.
```

37

DEPOSITION OF DANIEL ROBERT TRACY

1      A.   That's correct.

2      Q.   And before they knew it the water would be over

3  their head, right?

4      A.   That's correct.

5      Q.   So that was kind of the danger you were trying

6  to communicate to people at the shore edge?

7      A.   I wasn't really trying to communicate danger.

8  I didn't feel it was, so --

9      Q.   Okay.  Did you tell whoever suggested you put

10  up a danger sign that it's really not dangerous?

11      A.   I don't recall even discussing that.

12      Q.   I assume you never fell in that lake and tried

13  to get out of that lake once the liner was in place?

14      A.   No, I did not.

15      Q.   Do you know -- you only know of one person who

16  had and that was --

17      A.   That was hearsay.  That's what I heard, yeah.

18      Q.   Now, did you put up more than one sign?

19      A.   Yes, we did.

20      Q.   How many did you put up?

21      A.   I believe it was about six around that lake.

22      Q.   And you think it was sometime shortly after the

23  lake was lined?

24      A.   That's my best guess.

25      Q.   Would you have any documents to tell us exactly

46

DEPOSITION OF DANIEL ROBERT TRACY

1  when or at least maybe give us a month and year when

2  these signs were put up?

3      A.  Not that I recall.

4      Q.  And basically what the signs says is "Please

5  stay out of the lake.  No retrieval of golf balls."

6          Did I read that right?

7          MS. CORMIER:  I'm going to object that it

8  misstates the document since you left out a word.

9  BY MR. CORSIGLIA:

10     Q.  Okay.  That's why I asked the question.  So

11 correct me.  I said, "Did I read that right?"

12     A.  "Danger.  Please stay out of the lake.  No

13 retrieval of golf balls."

14         MR. CORSIGLIA:  The word I left out was

15 "Danger"?

16         MS. CORMIER:  Yes.

17         MR. CORSIGLIA:  We've been talking about

18 danger.  All right.

19 BY MR. CORSIGLIA:

20     Q.  You had testified earlier that prior to the

21 lake being lined that even on occasion you had gone in

22 to retrieve a golf ball?

23     A.  If I saw one sitting there?

24     Q.  Yeah.

25     A.  Right.

DEPOSITION OF DANIEL ROBERT TRACY

1      Q.  From time to time would you see golfers doing

2  the same thing?

3      A.  Yes.

4      Q.  All right.  After the lake was lined, did you

5  ever walk into the water to retrieve a golf ball?

6      A.  No.

7      Q.  You heeded the advice of the sign it sounds

8  like.

9      A.  Correct.

10     Q.  Did you post anywhere around this lake on a

11  sign what the depth of the lake was?

12     A.  No.

13     Q.  Was there -- was it part of your maintenance

14  program to try to keep the liner covered if you could on

15  the shore side?

16     A.  No.

17     Q.  For instance, and you've answered the question,

18  but I just want to --

19          Yeah, that's fine.  Thank you.

20          If you look at Exhibit 2 --

21     A.  Uh-huh.

22     Q.  -- does Exhibit 2 pretty much show kind of a

23  normal state of this lake vis-a-vis the liner --

24     A.  Yes.

25     Q.  -- on a regular basis?

DEPOSITION OF DANIEL ROBERT TRACY

```
 1        A.  (Nodding head up and down.)
 2        Q.  In other words, some portion of that liner
 3   would always be exposed and depending on the water level
 4   more may be exposed on certain -- at certain times than
 5   others?
 6        A.  That's correct.
 7        Q.  And what would be the fluctuations in the water
 8   level from, say, day to day or season to season?
 9        A.  It would vary from -- this was probably about
10   as high as the water level would get.  And it might go
11   down another probably five feet depending on how much we
12   were irrigating.
13        Q.  For the record, you are referring to Exhibit 2
14   showing the waterline which is pretty much typically as
15   high as it would get --
16        A.  Pretty much.
17        Q.  -- and the waterline would go lower depending
18   on irrigation needs?
19        A.  That's correct.
20        Q.  You mentioned it could go down as much five
21   feet.  Would that be during the hot season?
22        A.  That would normally be when you have heavy
23   irrigation due to the late summers.
24        Q.  And I understand it would be refilled at some
25   point in time.
```

PULONE & STROMBERG, INC. (408) 280-1253

DEPOSITION OF DANIEL ROBERT TRACY

1      A.  That's correct.

2      Q.  Is that almost immediate or would that take

3  time as well?

4      A.  It would all depend on irrigation.  It's how

5  much water was coming into it and how much you were

6  putting out.  So if the well was putting out more water

7  than we were putting out, of course it would fill the

8  lake.  It was normally late summer is when it would be

9  lower because that was the most demand for water.

10     Q.  We were told yesterday that based on the recent

11  renovation that's going on now that all Alpha Lake has

12  been removed essentially, there's not going to be a lake

13  there.  Correct?

14     A.  No, there is going to be a very large lake

15  there.

16     Q.  Where Alpha is?

17     A.  Yes.

18     Q.  Oh, okay.  Then I guess Mr. Ranson had --

19     A.  Yeah.

20     Q.  Is Charlie Lake going to stay there as well?

21     A.  Yes, and it's going to be much larger, too.

22     Q.  Okay.  So basically what's going on is that you

23  are expanding both bodies of water for irrigation

24  purposes?

25     A.  That's correct.

50

DEPOSITION OF DANIEL ROBERT TRACY

1      Q.  And I understand from Mr. Ranson that Charlie

2    Lake, currently there's a safety shelf in the design of

3    the lake.  Is that your understanding?

4      A.  Yes, that's correct.

5      Q.  Is there going to be a safety shelf in the

6    design of the Alpha Lake as well?

7      A.  Yes, there is.

8      Q.  And who is doing that work for you, do you

9    know?

10     A.  That work is done by Kevin Tucker & Associates.

11     Q.  Are the lakes -- respective lakes, have they

12   been formed yet?

13     A.  Yes, they have.

14     Q.  Are they lined yet?

15     A.  No, they are not.

16     Q.  They will be lined?

17     A.  Yes, they will.

18     Q.  And do you know who is doing the lining?

19     A.  The lining is going to be Tommy -- I'm sorry, I

20   said Kevin Tucker.  It's Tommy Abbott & Associates is

21   the contractor.

22     Q.  Abbott?

23     A.  Tommy Abbott & Associates.

24     Q.  Is the golf contractor?

25     A.  Is the golf contractor.  Kevin Tucker is the

51

DEPOSITION OF DANIEL ROBERT TRACY

1   designer.

2       Q.  All right.

3       A.  And they are going to do the work, Tommy Abbott

4   & Associates.

5       Q.  Do you know if Tommy Abbott & Associates is

6   going to sub out the lining portion of the lakes?

7       A.  As far as I understand, they are going to

8   work -- they are going to pull the lining themselves and

9   have somebody come in and do the seams and things.

10      Q.  Okay.

11      A.  That's what I understand.

12      Q.  And do you know which company is going to

13  supply the material?

14      A.  No, I don't.

15      Q.  Were you involved in any respect with respect

16  to the redesign of the respective lakes?

17      A.  I was involved in the picking of the contract

18  from the design of the course.  I was involved with

19  that.

20      Q.  And with respect to how to best design the

21  lakes, were you involved in that?

22      A.  No, I was not.

23      Q.  Did you take any photographs of the lake, Alpha

24  Lake, and the immediate area after this incident?

25      A.  Yes, I did.

                                                    52

DEPOSITION OF DANIEL ROBERT TRACY

1        Q.  And did you -- is it on digital camera?  Did

2   you take it on a digital camera?

3        A.  It was on a disk.

4        Q.  Did you turn those over to the attorney for the

5   United States?

6        A.  I don't remember who --

7        Q.  Do you have those still?

8        A.  I believe I do have some.

9        Q.  Would you please turn those over --

10       A.  Yes.

11       Q.  -- to the attorney for the United States?

12       A.  Yes.  I think it looks like a lot of these

13   photos right here.

14       Q.  They may be.

15           Who took the photo that shows you in Exhibit 1?

16       A.  I don't remember.

17       Q.  Was it with your camera?

18       A.  I don't remember.

19       Q.  Do you know why that photo was taken?

20       A.  I don't remember.

21       Q.  Do you know when it was taken?

22       A.  No, I don't.

23           MR. CORSIGLIA:  I wasn't going to mark this,

24   but I want to show it to him and have him confirm my --

25   if you want to mark it, it's up to you guys.

                                                        53

1

2

3

4  STATE OF CALIFORNIA      )
                           )    ss.
5  COUNTY OF SANTA CLARA    )

6

7          I, JEAN H. VAUGHN, a Certified Shorthand

8  Reporter in and for the State of California, hereby

9  certify that the witness in the foregoing deposition,

10                  DANIEL ROBERT TRACY,

11 was by me duly sworn to tell the truth, the whole truth

12 and nothing but the truth in the within-entitled cause,

13 and that the foregoing is a full, true and correct

14 transcript of the proceedings had at the taking of said

15 deposition, reported to the best of my ability and

16 transcribed under my direction.

17

18

19 Date _June 11_, 2008.

20                              CSR Number C-4139

21

22

23

24

25

                                                        84









Ex 2
D.Tracy
6/4/08

V/VENTIMIGLIA, JOSEPH/CIV
CCN: 30NOV05-SWMY-0038-7HNA



**MPGC Hole 3 Pond**
Not to Scale

LEGEND
A - Approximate area of unattended golf bag
B - Approximate location of drag marks on black
    plastic lining
C - Hazard Stake
MEASUREMENTS
Pond Circumference: 460'
Pond Length: 204'
Pond Depth: 12-14'
Pond Width (at it's widest): 85'
Distance of A to edge of pond: 7'
Distance of A to C: 15'

Sketched by: S/A Brian A. Van Cleef
Date Depicted: 30NOV05



EX 3
D.Tracy
6/4/08



© 2005 AE, LLC
© 2005 GDT, Inc

Exhibit C

NOT FOR PUBLICATION UNTIL
RELEASED BY THE
HOUSE ARMED SERVICES COMMITTEE

STATEMENT OF

MR. JOHN BAKER

BEFORE THE

HOUSE ARMED SERVICES COMMITTEE

SUBCOMMITTEE

ON

MILITARY PERSONNEL

APRIL 17, 2008

NOT FOR PUBLICATION UNTIL
RELEASED BY THE
HOUSE ARMED SERVICES COMMITTEE

**Opening Remarks**

Mr. Chairman and Military Personnel Subcommittee members, it is a pleasure to report to you on the many significant advances that were made in Fiscal Year (FY) 2007 in the Navy's Morale, Welfare and Recreation (MWR) program. Building on previous initiatives and with strong support from Navy leadership, Navy MWR and Child and Youth Programs (CYP) aggressively implemented several innovative enhancements and set the stage for even more progress in the years to come.

**Overview**

Navy MWR professionals around the world continue their outstanding efforts to help Sailors and their families sustain morale and readiness wherever they serve. MWR continued to provide the Fleet and deployed ground units with equipment to maintain high fitness levels; internet services, through both landlines and wireless sources; recently released motion pictures; around-the-clock child care at most fleet concentration areas; and leisure time opportunities that reflect our concern for the physical and mental well-being of the Navy family. We have also expanded the scope of MWR services to help support Individual Augmentees and wounded warriors in non-traditional settings such as in Army pre-deployment camps and hospitals or rehabilitation centers.

Commander Navy Installations Command (CNIC) has embarked on "Navy Shore Vision 2035" which encompasses an aggressive MWR capitalization strategy with $96M million in appropriated funds programmed for fitness centers and $42M million for child development centers included in the President's FY 2009 Budget Request. In addition, we are assessing funding requirements to improve Single Sailor/Liberty Centers which support our junior Sailors. Finally, the Navy continues its aggressive nonappropriated fund (NAF) construction program to maintain and enhance our business activities. These investments all demonstrate the Navy's long-term commitment to enhancing total force readiness

Our customers appreciate the difference these efforts are making and have told us that their level of overall satisfaction remains high and continues to improve. Our 2007 MWR customer satisfaction survey reported a level of satisfaction of 84 (on a scale of 100), which is one point higher than in FY 2006 and significantly higher than industry benchmarks (73). Some key developments that occurred in program areas include the following.

**Deployed Forces Support Program**

As part of its mission of being the "Command Supporting the Warfighter", CNIC continues to ensure that Sailors at the "tip of the spear" are getting the fitness, recreation, and leisure equipment and supplies they need. Deployed Forces Support professionals continue to provide fitness equipment and recreation support programs to deployed forces at sea and ashore. In FY 2007, CNIC distributed more than 20,000 pieces of recreation and fitness equipment to the Fleet. Equipment was centrally purchased and distributed throughout the worldwide network of Deployed Forces Support specialists at fleet concentration centers. Additionally, Deployed Forces Support personnel provided 9,500 pieces of fitness, sports and recreational gear to more than 110 commands/units in isolated and remote areas of the world to support vital off-duty leisure opportunities.

In order to be more effective in assisting Navy's deployed ground forces, CNIC has undertaken several actions during the past year. Specifically, CNIC:

- Placed two recreation professionals on the ground in the 5th Fleet/NAVCENT Area of Responsibility to further ensure complete support of ground forces and to maintain proper equipment and supply controls. These professionals work with Force, Regional, and Unit Leadership on a regular basis to make sure we are providing Component Commanders the necessary support.

- Revised and upgraded deployment kits (i.e. basic recreation equipment and supplies) based on the number of personnel at each site.

- Established the "Holiday Gift Box Program" in which each deployed ground Sailor receives a holiday gift box that includes items such as candy, holiday cards, free phone cards, and t-shirts.

To provide positive leisure support, 27 civilian recreation and fitness professionals live and work onboard aircraft carriers, ampbibious assault ships, and submarine tenders. CNIC has also established a new program that placed two fitness professionals on tbe waterfront at Naval Station Norfolk, VA to further assist fleet units. These individuals work directly with ships, concentrating on small ships and submarines pierside to offer assistance and provide pierside fitness activities, Fitness Enhancement Program (FEP) guidance, and fitness instruction. Based on metrics showing marked improvement in fitness test scores, expansion of this program is already underway for 2008.

**Fitness**

CNIC Fleet Readiness is committed to establishing a "Fitness for Life" program for all members of tbe Navy community. The primary goal is to help people make healthy lifestyle changes. Focusing on that key point, Navy Fitness is building programs, services and activities that will assist people in making healthy lifestyle behavioral changes. The campaign slogans are "Exercise Your Options" and "Stay Healthy-Stay Fit-Stay Navy". The goal of the CNIC Fitness program is to create a total fitness program for all members of the Navy community in accordance with Department of Defense (DoD) and Navy instructions, which acknowledge fitness as a vital component of readiness and essential to the general health and well-being of all personnel.

In FY 2007 all Navy Fitness Centers were resourced adequately and established programs and services to increase physical activity and nutrition awareness for three patron groups: youth, families, and personnel over 40 years of age. Navy Fitness Centers attained 100 percent compliance with DoD core Physical Fitness Standards in 2007. The FY09 Budget request includes Military Construction of 3 fitness complexes in 2009. These projects are critical to ensuring the highest levels of readiness for our Sailors.

**Individual Augmentee Support**

Individual Augmentees (IAs) are Sailors who support or "augment" another Navy, Marine Corps or Army commands. Sailors usually go to their IA assignment on temporary orders and return to their current or "parent" command once they complete their assignment. Assignments vary in length from a few months to a year or more.

The Navy is currently providing quality of life support to Navy IA personnel at various training sites. Many of these sites presented significant challenges to meet the needs of the 21st century Sailor. Their needs can be grouped into a few major categories: habitability, Internet connectivity, transportation, recreation, and fitness support. The Navy is providing internet and wireless connectivity through Army contracts with internet service providers and "air cards" at various Army training bases. Additionally, fitness equipment, passenger vans, recreation deployment kits, various electronic game systems (e.g., Xbox 360, and Wii), flat-screen televisions, satellite TV service, and portable 8mm movie systems have been delivered. The type of support being provided is similar to what is typically available to Navy personnel aboard ships and at almost every ashore installation. The positive reception of this program by our IAs has been very gratifying.

**Wounded Warrior Support**

MWR support is currently being provided for severely injured service members through-out the Navy. For example, in San Diego, the southwest region MWR activity is working in conjunction with Naval Medical Center San Diego (Balboa) to offer a wide-range of adaptive recreational activities for severely injured service members or "wounded warriors". MWR is working closely with Balboa's Warrior Athlete Program, which serves recovering injured military members, family members, or veterans who cannot participate in ambulatory sports and fitness activities. The program offers a variety of opportunities to play sports, improve fitness levels and enhance overall health and lifestyle. Additionally, Naval Base San Diego, CA is retrofitting facilities to ensure disabled accessibility and usability. Currently, a swimming pool ramp and access chair for the Admiral Baker Pool, a lift chair for the Admiral Prout Pool, and disabled accessible fitness and aerobic equipment are being provided. The programs in San Diego that prove to be the most beneficial will be exported to other Navy locations that also support "wounded warriors".

MWR also offers top priority for access to child and youth programs to wounded warriors and their families. In FY09 as well as over the long run, Navy will continue to work closely with DoD to ensure a well planned program that supports wounded warriors.

**Movie Program**

The Navy Movie Program continues to be one of the most popular recreational activities for Sailors and their families. Program venues range from shipboard to base theaters to Liberty and Recreation Centers and to isolated and remote shore units, demonstrating that the Navy has a movie program that is flexible and adaptable to any environment. The Navy Motion Picture Service (NMPS) purchased and distributed 198 movie titles and processed more than 300,000 videotapes and 13,000 cans of film to 810 Navy fleet and shore sites, as well as Marine Corps, Coast Guard, National Oceanographic Atmospheric Administration, Military Sealift Command and Department of State locations worldwide. These efforts resulted in over 23 million fleet viewing hours and 5 million customers ashore in FY 2007.

Patrons at our overseas base theaters enjoyed 34 of the biggest movies released last year just a week or two after their U.S. premiere. CONUS audiences were treated to 19 free admission sneak previews attended by 120,000 Sailors and their families. Deployed forces received 14 early tape releases that included such popular titles as "Fantastic 4: Rise of the Silver

3

Surfer", "Live Free or Die Hard", and "Night at the Museum". The Navy also hosted three lucky contest winning Sailors and their children in Charlotte, NC, for the world premiere of Disney's animated feature "Cars".

NMPS began the transition process to digital delivery of movies by awarding a contract for an encrypted DVD player to replace the less secure analog videotape service currently being used. Switching to this new technology will blend with the Naval Media Center's plan to convert shipboard distribution of entertainment and training programming to a digital platform. We expect to begin rollout of this program in FY 2008.

NMPS continues strong support and service to our forward deployed forces via the mobile movie program known as Theater-In-A-Box (TIB). Forty-five of these equipment packages have been shipped, along with 10,000 movies on tape. The Fleet continues to receive updated versions of their Cinema At Sea (CAS1) package which provides each ship with the capability to present large-screen movie and special event programming.

## Library Program

Navy libraries continued their upward performance trend of the past few years by attaining 91 percent compliance rate with core DoD MWR library standards, up from 90 percent in 2006. In addition, eight Navy libraries attained a 100 percent score on meeting these standards, an increase from five in 2006.

Navy also continued to enhance library services delivered via electronic media hosted by Navy Knowledge Online (NKO). Audio book access increased to over 11,000 titles, downloadable music now includes more than 1300 titles and access to over 500 new videos. Library service to forward deployed forces included 500 new laptops for shipboard Library Multimedia Resource Centers (LMRCs), 175,000 popular paperbacks, and 12,000 units of a new service called Playaway Books, which are self contained, battery-operated audio books the size of a credit card. To ensure ongoing professional development, the Navy continues to participate in the annual Joint Services Library Conference, a cooperative effort with the Air Force that combines training and library skill development for shore library personnel. In support of distance learning and self-improvement opportunities, the Navy increased access to College Level Examination Proficiency (CLEP), DANTES Subject Standardized Tests (DSSTs), and Armed Services Vocational Aptitude Battery Practice Tests (ASVAB). Expanded access to all these services has been accommodated via upgraded and expanded computer equipment and by providing no-fee wireless internet service to customers.

## Food and Beverage

Navy MWR food and beverage programs are on-base, customer-driven business activities, ranging from full-service "clubs" to quick-service "snack bars". MWR food and beverage programs promote and maintain the well-being, morale and efficiency of the Navy community and foster camaraderie and esprit de corps consistent with Navy values as a benefit of military service.

There are more than 400 MWR Food and Beverage operations world-wide serving our Sailors and Navy community. MWR food and beverage outlets include full-service dining rooms, catering services, conference centers, snack bars, casual dining pubs, taverns, cocktail lounges, delis, coffee shops, and nightclubs. They can be found in locations such as clubs,

catering and conference centers, recreation centers, golf clubhouses and bowling centers. Revenue from MWR food and beverage operations accounts for over 45 percent of our total Category C business activity revenue.

We have installed food and beverage "branded concepts" in all 13 Navy regions in response to customer interest. Some of our more popular brands include A&W, KFC, Pizza Hut, Mean Gene's Burgers, Starbucks-We Proudly Brew, Smash Hit Delis and Guinness Casual Dining Irish Pubs. We now have more than 100 branded food & beverage outlets. MWR has also partnered with the Navy Exchange (NEX) by using its contracting capabilities to source national brands from their portfolio. Examples of some of those efforts include a full-service Starbucks on Naval Air Station Pensacola, Florida, Applebee's on Naval Air Station Sigonella, Italy, Taco Bell on Submarine Base Bangor, Washington, and Subway on Navy Regional Contracting Center, Singapore.

Additionally, we have recently completed an Intra-service Navy-wide Food Service Assessment. The assessment included MWR, NEX and Navy Supply Corps food service programs. Results from the assessments are being tabulated and should be available later this year to help optimize the number of product delivery outlets on base. Finally, Navy MWR is working with its vendors and other food service professionals to eliminate trans-fat in its food offerings by the end of FY 2008 in a fashion similar to initiatives in other U.S. cities.

## General Recreation

### Liberty Program:

The Liberty program positively affects the quality of life of single and unaccompanied military personnel and contributes to Fleet readiness.    Liberty programs provide high-energy recreation opportunities, quality entertainment experiences and development of personal leisure skills in an alcohol and tobacco-free environment. These activities are delivered through 80 Liberty programs Navy-wide. A robust Liberty Program is an integral part of Navy's efforts to reduce the number of alcohol related incidents.

This year, the Liberty program expanded its services by offering free wireless internet in all CONUS locations. Additionally, in an effort to provide the optimum recreational facilities for single Sailors, renovations have moved forward on Liberty centers at Naval Base Coronado, California, Naval Air Station Lemoore, California, Naval Surface Weapons Center Dahlgren, Virginia, Naval District Washington (Anacostia), Naval Base Guam, Naval Submarine Base New London, Connecticut and Naval Weapons Station Earle, New Jersey.

Additionally, Liberty centers were reopened after extensive renovations at Naval Air Facility El Centro, California, Naval Weapons Station Charleston, South Carolina, Naval Air Facility Whiting Field, Florida, Naval Technical Training Center Corry Station, Florida, and Naval Support Activity Souda Bay, Greece. The Liberty centers at Joint Reserve Base New Orleans, Louisiana, Naval Support Activity New Orleans, Louisiana, and Naval Construction Battalion Center Gulfport, Mississippi that experienced substantial hurricane damage have undergone repairs and are all now operational. They offer Sailors at each location computer and internet services, the latest video games, pool/game tables and a wide-ranging calendar of special events and activities.

5

In an effort to ensure the program continues to be meaningful to the junior enlisted community, MWR activities are in the process of assessing all Liberty centers to determine the need for future renovations, expansion and new construction where conditions warrant.

**Entertainment:**

Navy MWR continues to be heavily engaged in partnerships with Armed Forces Entertainment, USO and the National Endowment for the Arts to facilitate delivery of first-rate, live entertainment programs (e.g., comedians, musicians, celebrities, sports stars) to deployed and afloat units throughout the world, including family-friendly performances for Navy families in CONUS.

In the past four years, the program has facilitated over 1,500 shows reaching more than 750,000 active duty and family members worldwide. Entertainers are selected based on availability, popularity and specific needs of installations and deployed units. This year, the Harlem Globetrotters, Geoff Bodine (NASCAR driver), Marc Broussard, Adassa, Sean Paul and various NFL Players, as well as others, have traveled around the world including locations in the Middle-East and to out-of-the-way places, such as Djibouti and Guantanamo Bay, to entertain and otherwise bring goodwill to our troops. In 2007, we were able to bring more Urban/Hip Hop/Latino artists as part of our touring schedule.

In the short-term, our focus continues to be on increasing the variety of entertainment in response to customer demand. Our Commanders have said that having these types of events do more than almost anything to lift Sailors' morale.

**Golf:**

Golf remains very popular with active duty as well as retirees at most of our course locations. In FY 2007, projects were approved to replace the clubhouse on Naval Air Facility Atsugi, Japan and to renovate the golf clubhouse at Naval Air Station Meridian, MS.

The Navy is also partnering with the U.S. Professional Golfers Association on several initiatives to increase Sailor interest and participation in golf. These programs are targeted at women, juniors and disabled golfers. Navy is committed to providing access and necessary accommodations for all eligible golfers, regardless of disability, at Navy MWR golf courses. We have purchased six specialized golf carts to accommodate physically challenged golfers. Two specialized cars each were purchased for the Admiral Baker Golf Course, San Diego, CA, Seal Beach Golf Course, Los Angeles, CA and Aeropines Golf Course at Naval Air Station Oceana, VA. These golf courses were selected because they are in fleet concentration areas where the carts are more likely to be needed. So far, demand for these cars has been limited but we are promoting their availability.

This year, the Admiral Baker Golf Course hosted wounded warrior golf clinics over a six week period during the spring season. Each two-hour session was conducted by six PGA professionals. Each clinic hosted 8-10 participants and included time on the driving range, putting green, short game area, and practice hole. Participants who had lost lower limbs learned to use the MWR-provided specialized golf carts which enhance mobility. These clinics, co-sponsored by PGA of America and Disabled Sports USA, are helping "wounded warriors" and disabled golfers continue to participate in the sport of golf and are also introducing golf to those who did not play previously.

Unfortunately, in recent years, the exception to the mostly positive news in the golf program has been a trend of declining activity at a number of Navy nine-hole golf courses. The average number of rounds dropped to all-time lows of less than 3,000 with corresponding reductions in cash flow. A few of the reasons for reduced play include substandard playing conditions, local demographics, BRAC impacts, stepped-up force protection measures, and increased competition in certain parts of the country. In FY 2007, four nine-hole golf courses (Naval Weapons Station Yorktown, Virginia, Naval Surface Warfare Center Dahlgren, Virginia, Naval Surface Warfare Center Indian Head, Maryland, and Naval Support Activity Mechanicsburg, Pennsylvania) were closed due to reduced play and subsequent lack of profitability.

## Bowling:

Bowling is currently enjoying a period of growing popularity and financial stability. By applying new technologies, broadening customer focus, and offering an assortment of entertainment options bowling has been able to draw on our country's renewed emphasis on longstanding family values. Similarly within the Navy, bowling is attracting a wider range of eligible patrons. By improving facilities, launching aggressive marketing programs, and adding complementary activities most bowling centers have redefined themselves as "family entertainment centers", which have made them more effective competitors for the limited entertainment dollar and scarce spare time of active duty service members and their families.

Also of importance, our bowling managers are working with the Bowling Proprietors Association of America to develop new programs for patrons, including adaptive bowling programs for severely injured military personnel. A number of Navy bowling centers have purchased wheelchair accessible bowling ball ramps to enable the disabled to participate in bowling programs. Some MWR bowling centers in the Southwest Region have also hosted open bowling programs for wounded warriors.

## Marinas:

Navy installations are typically situated on the waterfront where marinas are logical extensions of the topography. Currently, the Navy has 33 marinas providing programs and services that are highly valued by a growing segment of the MWR customer base. Most Navy marinas offer boat slip rentals, mooring and a full-range of marina services.

We are continuing in FY09 and beyond to replace or repair marina infrastructures that are beginning to reach the end of their useful lives. Such projects this year include replacing a sailing classroom where sailing and boating safety instruction is held to adding slips to accommodate increasing boater demand.

## Information, Tickets and Tours (ITT) Program:

ITT program managers for the Navy, Marine Corps and Army are working with industry partners to develop an innovative forward-looking service delivery approach. The goal is to produce "ticket-less" vouchers that can be printed on demand at each ITT office as an alternative to maintaining large stocks of paper tickets. This method will simplify the contracting process and help national attractions reach a military market of more than ten million potential

customers. A single, centrally negotiated agreement will supplement local contracts and provide real-time access to military installations throughout the world. Unlike the current ticket program, vouchers will not require annual distribution, recall, and year-end reconciliation of accounts. In the long-term, we hope to provide authorized patrons direct internet access for purchasing tickets.

**Recreational Lodging:**

The Navy Recreational Lodging program has been realigned under CNIC Lodging, and will continue to be an important focus for Quality of Life programs. CNIC's goal is to provide eligible patrons high quality affordable lodging at vacation destinations in our domain.

Standardization of recreational lodging has been launched this year with a single-source contract for all amenities, linens, TVs, and such. This new initiative will help ensure patrons receive consistent service and quality furnishings at all recreational lodging locations. Additionally, patrons are experiencing new ease of reserving their vacation rental by choosing on-line reservations or calling the specific recreational lodging property directly. The popularity of Navy Recreational Lodging has grown steadily, triggering an increase in construction of new facilities to meet the demand. Recent examples include new cabins at Naval Weapons Station Yorktown/Cheatham Annex and Portsmouth Naval Shipyard's Great Pond facility.

**Child and Youth Programs (CYP)**

CYP continues to offer multiple delivery systems that include Child Development Centers (CDC), Child Development Homes (CDH), Child Development Group Homes, School Age Care, and a resource and referral program. In FY 2007, Navy programs cared for 45,780 children ages 6 months to 12 years and served over 70,000 youth ages 13-18 in 124 child development centers, 103 youth centers and 3,115 on- and off- base licensed child development homes. In FY 2007, these services achieved 70 percent of DoD potential need criteria and attained a 100 percent DoD certification rate for operational excellence. Our 100 percent DoD certification rate tells our Navy families that their children are receiving top-quality care that equals or exceeds the highest DoD and national standards.

Our objectives for FY 2007 were to improve deployed support programs, execute initiatives to expand capacity, focus on youth obesity prevention, sustain affordability of care, and ensure continued program quality. CYP met these objectives after a year of many significant advances. A few of the highlights include:

- To assist parents and children with the challenges of frequent deployments, an additional 100,000 hours of respite child care was provided for families of deployed service members. Now more than ever, this type of care is critical to our families – those that may not have needed child care support in the past now rely on this interim support.

- In ongoing efforts to combat youth obesity, CNIC has implemented a new world-wide youth fitness initiative called "FitFactor". It was developed as a means to increase youth interest and awareness in the importance of making healthy lifestyle choices.

- Sailors and their families continue to cite the lack of available, affordable child care as one of their top family readiness issues. With a current waiting list in excess of 8,100 children and an average waiting period of six months or more, Navy has launched an aggressive child care expansion plan adding 4,000 new child care spaces within the next 18 months. This

8

expansion includes construction of new child development and youth centers (including facilities open 24/7), commercial contracts for child care spaces, and expanding military certified home care. In addition to the new spaces, the Navy is converting 3,000 existing 3 to 5 year old spaces into infant to 2 year old spaces to meet the greatest demand, children under the age of three. Combined, these initiatives will reduce the waiting time for child care to less than three months Navy-wide, with first priority given to single military parents.

- Navy families continue to praise the quality and affordability of military child care. In a report released in 2007 by the National Association of Child Care Resource and Referral Agencies, entitled "We Can Do Better: Ranking of State Child Care Center Standards and Oversight" military child care center operations were ranked number one in the country.

**Overall Financial Condition of MWR**

MWR appropriated funds (APF) are provided through the Base Operating Support (BOS) budget line in the Operations and Maintenance (O&M) account. The funding environment continues to challenge us to seek efficiencies, while at the same time the importance of providing programs for the Navy Family is increasing. Global War on Terrorism (GWOT) funding provided critical program support for MWR in FY 2007, with MWR receiving over $60 million of such funding. This funding was executed to expand program support for deployed forces and to expand CYP support in fleet concentration areas. The FY09 Budget will allow us to remain on par with recent performance in these critical areas.

By far, the biggest NAF funding challenge for FY 2007 was the elimination of CNIC's NAF Bridge Strategy. In FY 2005 we implemented our "bridge funding strategy" to re-deploy Navy Exchange dividends, normally dedicated to NAF capital spending, for operational support. The bridge funding strategy was also used in FY 2006, but at significantly reduced levels from FY 2005. In FY 2007, the practice was completely eliminated and NAF funding was shifted to support capital spending. The two-year phase out period provided CNIC regional operators time to implement efficiencies without significantly degrading program delivery of valued customer services.

For FY 2007, Navy MWR fully implemented a capital funding strategy designed to leverage system assets and significantly increase the amount of NAF capital funding available for FY 2007 through FY 2009. This strategy allows the central capital fund to use existing cash balances for capital investment. The MWR/NEX Board of Directors has approved an annual NAF central and local capital funding target of $77 million. This target is the minimum investment needed each year to maintain existing facilities, provide needed computer upgrades, and expand program delivery. For FY 2007, the MWR Central Capital Program contained about $65 million in projects and Informational Technology (IT) spending. In addition, local capital investment amounted to $19 million. The combined investment total of $84 million exceeded our goal of $77 million.

Worldwide Navy MWR financial operations totaled about $922 million in FY 2007, which includes APF (direct and indirect), internally-generated NAF revenue, and Navy Exchange dividend distributions. This amount represents an increase of about $38 million from the previous year. In FY 2007 we exceeded the DoD minimum standard of 85 percent for APF support in Category A Mission Essential Programs by achieving 92.2 percent. In category B Community Support Programs, 61.5 percent of authorized costs were paid with APF, compared to the DoD minimum requirement of 65 percent. Category B programs were more dependent on

NAF to operate in FY 2007, with APF being targeted for execution in core Category A programs. However, the Navy remains committed to providing non-core Category B programs and funding with APF to the maximum extent possible.

## Facilities

The MWR Nonappropriated Fund Capitalization Program (NAFCON) represents a significant and dynamic commitment to the enhancement of services and programs for Sailors and their family members. The program includes twenty new construction, renovation, minor projects, and capital equipment investment approaching $60 million. This year's program reflects the continuing need for investment in business-based operations (14 projects at $43.2 million) and community support facilities (6 projects at $14.4 million). These initiatives span a broad project spectrum inclusive of recreational cottages, marinas, golf maintenance compound, clubs, youth centers, recreation vehicle parks, and beach lodging. Our capital enterprise strategies focus us on customer-driven services while striking a balance with revenue generation and community service opportunities.

This year we will also complete five modular child development centers made possible through the expanded authorization contained in the FY 2006 and FY 2008 National Defense Authorization Acts. This emergency intervention also includes the construction on two additional 24/7 Group Homes at Naval Amphibious Base Little Creek, VA and Naval Station Norfolk, VA. In addition, the First 5 Commission of San Diego is sponsoring two additional centers in San Diego. Of equal importance to these accomplishments is the leadership focus on the expansion of Navy child development centers, the impact of which we spoke to earlier in this testimony.

In addition to the above, our focus on the sponsorship of healthy lifestyles and total fitness through the replacement and modernization of our fitness centers is among the Navy's highest quality of life priorities. We believe this is the surest way to demonstrate the importance we place on the health and readiness of our top priority—our people. The results of our annual surveys indicate that fitness centers are rated as the highest priority by Navy personnel with utilization above 90 percent for all groups. Our challenge is to balance other competing mission requirements within resources provided. I thank you of your support for this important initiative and am pleased to relay that we will be awarding the first contract for the Naval Station Guam Fitness Center this year.

We are also working on better facilities for one other very important program, Single Sailor Liberty Centers. This program is focused on single Sailors and geographical bachelors within an alcohol-free and tobacco-free recreation environment. These centers will be the "anchor" facility that is bordered by complementary functions (comparable to civilian malls). We refer to this as our "clustering concept" which aligns quality services and program support to the needs of our warfighters.

## Business Processes

### Strategy for Our People.

Our human resource strategy remains focused on attracting, developing and sustaining a world-class, customer-oriented workforce.

CNIC's Fleet and Family Readiness (FFR) Training Branch is consolidating and centralizing training management and support for all of the quality of life communities including: MWR; CYP; Family and Bachelor Housing; Galleys and Food, Beverage and Entertainment; Navy Gateways Inns and Suites (NGIS), and Fleet and Family Support Programs (FFSP).

Our efforts will result in a standardized new-hire orientation process; F&FR programs support through the student intern program; application of performance-based and participant-centered training methodologies; endorsement and support of life-long learning; availability of cross-program training and cross-career competition; establishment of a structured F&FR mentoring system; execution of blended learning solutions that assure just-in-time, just-right, just-enough training; and implementation of the SAP Learning Solution (a learning and content management system). The goal of our people strategy is an efficient and effective world-class workforce, prepared to deliver the best possible customer experience, every time, everywhere.

### Marketing.

The Marketing and Multimedia Development branch continued its comprehensive approach to promoting MWR programs and services through news articles and feature stories, internal publications, tri-folds, posters, public service announcements, videos, interactive CD-ROMs and DVDs.

An interactive CD-ROM entitled "Europe: Your Passport to Adventure, " was designed and distributed to promote MWR and other Fleet and Family Readiness (F&FR) programs in Europe, as well as provide information about local customs, traditions and travel information. This product joins a list of other regional interactive CD-ROMs developed by the marketing team, including Japan, Guam and Korea, the Middle East and the Northwest region.

A comprehensive marketing plan was executed to promote physical fitness and nutrition to the entire Navy family. The "Exercise your Options" fitness campaign included nine posters with exercise and nutrition themes, a video public service announcement, and training videos.

Obtaining feedback on MWR programs and services remains an important marketing tool. Navy-wide assessments were administered in 2007 to measure patron satisfaction with various MWR programs, to measure employee job satisfaction, and to establish a baseline score that could be used for a Navy-wide food service assessment. The MWR customer satisfaction assessment was 84 on a scale of 100, which is considered excellent according to the Claes Fornell International (CFI) Group, an independent expert in the customer satisfaction measurement industry, which conducted the survey. The MWR employee satisfaction assessment, also conducted by the CFI Group, resulted in a score of 74, which is above comparable industry standards.

### Computer Services.

A state-of-the-art NAF management information system encompassing accounting, personnel, payroll and cash management is an essential element to enhanced efficiencies. The NAF accounting, cash management, personnel, and payroll modules of the system are now operational at all U.S. and overseas bases. The point-of-sale portion of the project is projected for completion by the end of 2008. This Accounting Information System (AIMS) system is integral to our continued efforts to streamline and reduce costs.

11

The Navy started implementing an online lodging system that includes a world-wide reservation system that allows customers to book official and recreational lodging and also helps streamline front desk operations. Plans include implementing the system at all naval installations that offer Navy Gateway Inns and Suites and recreational lodging facilities, such as cabins, cottages and RV parks, within the next 16 months. The new system will provide tools and processes that will help increase occupancy and provide outstanding customer service.

As a part of this implementation, the Navy initiated a partnership with the Air Force because we share the same requirements of assisting travelers with booking reservations, providing comfortable lodging and excellent customer service. This has truly become a joint project with the Air Force. We have standardized the software we are using and are sharing data centers and support personnel. In addition, we are leveraging the Navy Lodge's existing call center to provide customers a one-stop shop for all their reservation needs. This not only provides our customers with one Web site with the flexibility to book recreational or official travel at any Navy or Air Force facility, but it also streamlines our business processes and helps increase occupancy and reduce costs for both programs.

### Commercial Sponsorship.

Our central commercial sponsorship efforts have helped forge strong ties with industry and have also helped provide services to Sailors and their families that otherwise might not have been affordable. In FY 2007, total commercial sponsorship agreements entered into centrally were about $1.5 million. This is in addition to $2.5 million in cash and an estimated equivalent amount in services and products that local MWR activities obtain from sponsors in their areas. These agreements helped us to provide over 80,000 pre-paid phone cards to Sailors, holiday gift packages, entertainment, and reading materials.

### Disaster Preparedness.

MWR, in conjunction with CNIC regional emergency response offices and other family support programs, is equipped to provide temporary power, water, food service, recreation and child care facilities, recreational, and housing needs for first responders within just a few days. In addition, F&FR is prepared to surge counselors and other professionals as needed to disaster zones in support of Sailors and families. Hundreds of volunteers from around the Navy MWR community are also prepared to support their fellow teammates in disaster areas when needed. This organizational approach showed its great value again recently as MWR was a key player in support of evacuee needs during the recent fires in San Diego.

### Lean Six Sigma.

MWR has trained several team members to apply process improvement using Lean Six Sigma initiatives and have completed two projects that are now in the control phase. One project addressed the acquisition of nonappropriated fund purchased vehicles while the other improved how MWR prices out its overall appropriated fund requirements. This year, we will use Lean Six Sigma techniques to analyze the possibility of consolidating similar services under a single

12

roof to reduce waiting time for Sailors who use them and will also study how best to handle small purchases.

**Summary and Outlook**

FY 2007 was a year of exciting new developments and direction for MWR and the years ahead look even brighter. We are taking care of our Sailors and their families in a wide variety of venues. We are improving the key facilities in which MWR provides programs. We are greatly expanding Child and Youth programs to meet ongoing demand signals. We are reaching out to provide MWR services to our IAs and wounded warriors and their families in a variety of different venues. Our fitness programs continue to improve on their already high standards. We are continually checking with our patrons to make certain that we provide them with the services they need at a quality level equal to or exceeding the best in the industry. As a result, MWR continues to be a key weapon in ensuring the ongoing readiness and retention of Sailors throughout the Navy.

The Navy appreciates the great value that our Sailors and Congress place on MWR and Child and Youth Programs and we will continue to maintain and strengthen our commitment to do our utmost to meet those respective expectations. Thank you for your continued support.



**United States House of Representatives**
**House Armed Services Committee**

- About the Committee
- Committee Calendar
- Committee History
- Committee News Center
- Live Hearing Audiocasts
- Hearing Information
- Contact Information
- Republican Views
- HASC Home

**Search the site:**

Search |



☐ Printable version

### Statement of Chairwoman Susan Davis
### Military Personnel Subcommittee Hearin
### Military Resale and Morale, Welfare and Recre
### Overview

April 17, 2008

"Today, the subcommittee will turn its attention to military resale and and recreation or MWR programs. When service members and their fa community quality of life, they are referring to the commissaries, exch development centers, youth centers, libraries, gymnasiums, playing fie courses, clubs, restaurants, recreation equipment, and hobby shops th the military community.

"Many Americans would consider the package of facilities and services most installations and declare that it is better than what they have ava communities. But few would challenge these community resources as because Americans recognize the remarkable sacrifices and stress that military life, particularly today given the extreme tempo of the ongoing

"Our families need these strong and reliable centers in their lives and absolutely must be confident that their families are well cared for in th programs we will talk about today are a critical part of that confidence

"In short, the Members of Congress and particularly the Members of t are believers. While we require no convincing, I worry about the comm armed services to sustaining these programs. With the exception of ch appropriated funding support for these programs has been unenthusia: to be less concerned about the challenge of maintaining a caring comn environment. I hope the day does not come when we regret the loss c community in the military because we no longer appreciate its value as

"We also have a number of questions concerning the management of and the stewardship of the nonappropriated dollars that belong to the airmen, and marines that serve our nation."

| Fax: | 2120 Rayburn House Office Building |
|------|-----------------------------------|
| (202) 225-9077 | Washington, D.C. 20515 |

*Files and links on this site may require using Apple Quicktime, Adobe Acrobat, or Real Player.*
*download the most recent versions here (Flash | Real | Quicktime | Acrobat*