***E-Filed 9/10/09*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KATHLEEN VENTIMIGLIA, et al., | **No. C 07-5481 RS** |
| Plaintiffs, | **ORDER DENYING MOTION TO DISMISS** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

I. INTRODUCTION

In a tragic accident in November of 2005, Joseph Ventimiglia drowned in an artificial lake on a golf course owned and operated by the United States Navy. Plaintiff Kathleen Ventimiglia,[1] Joseph's widow, seeks to hold the government and various private defendants liable for what she contends were safety flaws in the design and maintenance of the lake. The United States moves to dismiss plaintiff's claims against it for lack of subject matter jurisdiction. The threshold question presented by the motion is whether the Federal Tort Claims Act ("FTCA"), whereby the government

---

[1] Kathleen Ventimiglia is also guardian ad litem for her minor children co-plaintiffs. For convenience, this order will refer to plaintiff in the singular.

1

waives its sovereign immunity in certain limited circumstances, operates to allow plaintiff's claims. Under the so-called "discretionary function exception" of the FTCA, 28 U.S.C. § 2680(a), the government retains immunity for acts or omissions of its employees that involve decision-making grounded in issues of social, economic, or political policy. Invoking that exception, the government now moves to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction.

Although the government has shown that some of the specific decisions about which plaintiff complains did involve the exercise of discretion by its employees in matters involving social, economic, or political policy, it has not met its burden to show that its alleged failure to construct a "safety shelf" when a plastic liner was installed in the lake potentially implicated any public policy issue. Accordingly, the motion to dismiss will be denied.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over the claims asserted. Fed. R. Civ. P. 12(b)(1). An objection that a federal court lacks subject matter jurisdiction may be raised by a party at any stage in the litigation. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). A motion to dismiss for lack of subject matter jurisdiction may be made on the grounds that the lack of jurisdiction appears from the "face of the complaint," or may be based on extrinsic evidence apart from the pleadings. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *McMorgan & Co. v. First Cal. Mortgage Co.*, 916 F. Supp. 966, 973 (N.D. Cal. 1995). Parties may bring suit against the United States only to the extent that they can show the government has waived sovereign immunity. *United States v. Orleans,* 425 U.S. 807, 814 (1976); *Soldano v. United States*, 453 F.3d 1140, 1145 (9th Cir. 2006).

III. BACKGROUND[2]

A.  The Golf Course and Alpha Lake

The United States Navy owns and operates approximately thirty-six golf courses as part of its Morale, Welfare and Recreation ("MWR") program.  These courses provide recreation for Navy personnel and civilian employees, and also serve as a source of revenue for funding other MWR programs.  The accident at issue here occurred at Monterey Pines Golf Course ("MPGC"), which the Navy built in 1963 on the grounds of the Naval Postgraduate School in Monterey, California. MPGC includes an eighteen hole course, support structures, and a clubhouse.

The course features three major artificial lakes, designated as Alpha Lake, Bravo Lake, and Charlie Lake.  Alpha Lake primarily serves as a source of irrigation, but also presents a course obstacle to enhance play and course aesthetics.  At the time of the drowning, the lake was twelve to fourteen feet deep. The slope of the underwater drop-off varied from 1:1 to 1:2, which is considered steep.  A floating fountain was situated in the center of the lake, supported by ropes connected to the banks.  Surrounding the lake were six warning signs that read: "DANGER: PLEASE STAY OUT OF THE LAKE.  NO RETRIEVAL OF GOLF BALLS."  Other than red stakes indicating a lateral hazard and the warning signs, there were no other structures near the lake.

Alpha Lake had been drained and re-graded as part of a renovation in 2002.  During the project, a plastic liner was installed to prevent water loss through seepage into the soil.  The rim of the liner was exposed above the surface of the water around the entire circumference of the lake, leaving a plastic ring between the water and the grass on the course.  There is evidence of some discussions during the installation of the plastic liner in 2002 regarding the possibility of building a "safety shelf" into the slope of the lake -- a ledge twelve to twenty-four inches below the waterline that can make it easier for anyone who might fall in to climb back out. Such shelves appear to be "industry standard" in settings like these, and indeed such a shelf had been incorporated in Charlie

---

[2] The facts described in this order are taken from the complaint and the evidentiary submissions of the parties.  Except as specifically noted, there do not appear to be material disputes regarding any of the factual matter set out herein.

3

Lake when it was renovated and lined with plastic some years earlier. Ultimately, however, no safety shelf was built.

B. <u>The Accident</u>

On November 29, 2005, fifty-two year-old Joseph Ventimiglia, a retired Department of Defense civilian employee, began a round of golf by himself at MPGC. Later that day, an unattended golf bag was reported near the southwest corner of Alpha Lake. When Ventimiglia failed to return home that evening, his wife filed a missing persons report. The following day, MPGC employees identified Mr. Ventimiglia's vehicle in the parking lot. Police began a search of the lake, where they found drag marks on the plastic that lined the lake's banks. A diver located Mr. Ventimiglia's body in the lake. A post mortem examination concluded that the cause of death was asphyxiation due to accidental drowning.

C. <u>The Navy's Golf Course Design Considerations</u>

The Navy's MWR division administers a wide variety of recreational activities at Navy facilities throughout the world. As noted, the golf program is intended to provide recreational opportunities for enhancing the well-being of Navy personnel and their families. The program ultimately contributes to the MWR division's broader goal of improving personnel retention.

The Bureau of Navy Personnel ("BUPERS") provides policy and operational standards for the administration of the MWR program through BUPERS Instruction 1710.11C. The golf program is designated as a revenue generating activity, and therefore is sustained entirely by non-appropriated funds. That is, profits derived from it are used to sustain it and other MWR programs. The BUPERS Instruction advises that the golf course should maintain a 10% minimum profit margin. To meet this goal, golf course managers are encouraged to provide high quality courses to increase customer satisfaction.

As noted above, Alpha Lake's primary function was to provide a water source to sustain the quality of turf around the course. The plastic liner was installed to minimize water loss. Water is

the most significant cost in operating a golf course. The government contends therefore, that grading, depth, and lining of Alpha Lake all implicate the amount of water it could store, and allowed MPGC to comply more fully with its mandate to maintain healthy grass and terrain on the course. Similarly, the government contends that the design and placement of warning signs or other possible safety precautions (such as fences, guardrails, grab ropes, or buoys) all involve issues of costs and aesthetics that would impact the perceived quality of the golfing experience on the course.

## IV. DISCUSSION

A.   Discretionary Function Exception

The FTCA waives the sovereign immunity of the United States for certain torts committed by government employees where a claim would exist if the government were a private party. 28 U.S.C. § 1346. This waiver of immunity is limited by the discretionary function exception, which bars claims based upon a government employee's exercise or performance of a discretionary function or duty, or the failure to exercise or perform such a duty, whether or not the discretion involved was abused. Id., § 2680(a). The purpose of this exception is to insulate governmental decision-making from "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

While plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, the government bears the ultimate burden of proving the applicability of the discretionary function exception. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). If the government meets the burden of proving that the discretionary function exception applies, then the federal courts lack subject matter jurisdiction to hear the plaintiff's claim. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002).

In *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988), the Supreme Court set out a two-prong test for determining whether the discretionary function exception bars a claim against the

government. First, a court must consider whether the challenged conduct involved elements of judgment or choice; attributes not present where a federal statute, regulation, or policy specifically prescribes a course of action for employees to follow. *Id*. Second, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id*. The exception protects only "governmental actions and decisions based on considerations of public policy," i.e., those "grounded in social, economic, and political" considerations. *Id.* Thus, for example, even where no specific statute, regulation, or policy prescribes a particular course of action, if a decision turns only on "technical, scientific, and engineering considerations" without policy implications, then the discretionary function exception does *not* apply. *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1031 (9th Cir. 1989).

There is, however, no requirement that a challenged decision or action have been the product of an *actual* weighing or consideration of public policy issues. "[I]t is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision.... [T]he relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis." *Id.* at 1028 (quoting *United States Fidelity & Guaranty Company v. United States*, 837 F.2d 116, 120-21 (3d Cir.)).

B.  <u>Application of the Two Prong Test</u>

Plaintiff contends that the Court has jurisdiction over her claim for wrongful death because, (1) the Navy acted contrary to statute, regulation, or policy with respect to its failure to incorporate safety measures within Alpha Lake; and (2) the Navy has failed to establish that its omission of safety measures at Alpha Lake was the result of a balancing of policy considerations because, plaintiff contends, virtually *no* consideration of safety issues was undertaken at all. Defendant counters that no statute, regulation, or policy specifically required any particular safety measures and that all of the design features challenged by plaintiff implicate decisions that would be

6

"susceptible" to a weighing of policy considerations, whether or not any such factors were actually considered.

### 1. Conduct Subject to Judgment or Choice

The government argues that the first prong of the *Berkovitz* test is easily satisfied here because plaintiff cannot identify *any* statute, regulation, or policy that explicitly governed the design features (or lack of features) that plaintiff is challenging. Indeed, plaintiff admits that no federal statute or regulation governed the Alpha Lake renovation. Instead, plaintiff cites to the Navy's Golf Course Planning Principles, the Navy's BUPERS Instructions, and two pages from a handbook by the California Stormwater Quality Association to argue that the Navy failed to follow certain guidelines set out therein.

These materials, however, do not impose mandatory and specific requirements on the Navy sufficient to take the challenged conduct outside the discretionary function exception. As noted above, a decision or action is not discretionary only if a guiding statute, regulation, or policy imposes both mandatory and specific requirements. *Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1027* (9th Cir. 1989). The Golf Course Planning Principles unequivocally sets forth that "[i]t is intended to be a design guidance tool" to assist the planning process. Nowhere does it state any requirements, rather it merely provides general guidance as to what should be included in any new golf course or expansion of any existing course. Similarly, the section of the BUPERS Instruction that plaintiff relies upon is expressly entitled "Guidelines," and the handbook of the California Stormwater Quality Association uses the same term."[3] General guidelines and policies, without more, "necessarily involve an element of discretion in determining the precise manner in which to meet those goals." *Blackburn v. United States*, 100 F.3d 1426, 1433 (9th Cir. 1996).

---

[3] Additionally, it is not at all clear how the California Stormwater Quality Association would have jurisdiction to impose requirements on the Navy.

2. <u>Economic, Social, or Political Policy</u>

The Ninth Circuit has noted the "difficulty of charting a clear path through the weaving lines of precedent regarding what decisions are susceptible to social, economic, or political policy analysis." *Whisnant v. United States*, 400 F. 3d 1177 (9th Cir. 2005). Here, the government argues that all of its challenged actions (or inaction) relate to how Alpha Lake and the surrounding areas of the golf course were *designed*, and that the design necessarily implicated numerous policy issues. As a general matter, case law suggests design choices usually implicate policy issues sufficient to trigger the discretionary function exception. See *Terbush*, 516 F. 3d at 1135, (rejecting plaintiffs' claims of negligence in the design and construction of a wastewater system that allegedly created a hazard to rock climbers); *Kennewick*, 880 F. 2d at 1028, (holding design of canal "was rooted in economic policy judgments"); *Whisnant*, 400 F. 3d at 1181 ("we have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* is not.")

Plaintiff contends that her claims relating to insufficient warning signs, the lack of any fencing or guardrails, and the lack of other possible safety devices such as grab ropes or buoys, may go forward because she is in essence arguing improper *implementation* of safety measures, rather than faulty design. Relying on *Whisnant*, plaintiff asserts there is effectively a "carve out" for safety matters that precludes the government from showing that its actions or inaction satisfies the discretionary function exception. The *Whisnant* court did note that "judgments concerning safety . . . are rarely considered to be susceptible to social, economic, or political policy." 400 F. 3d at 1181. That statement in *Whisnant*, however, arose in the context of distinguishing "matters of scientific and professional judgment" from policy decisions. Moreover, the *Whisnant* court went on to explain that the plaintiff in that case "was not alleging that the government was negligent in designing its safety inspection procedures; rather, he charges that the government was negligent in following through on those procedures . . . ." 400 F. 3d at 1183.

Here, plaintiff's attempt to characterize the government as similarly having failed to implement its safety procedures is unpersuasive. The plain gravamen of plaintiff's claims relating

8

to warning signs is that the government was negligent in *designing* its safety procedures. Likewise, with respect to fences, grab ropes, buoys, or similar devices, the alleged problem was the failure to design such features at all. While by definition the government did not "implement" what had never been designed, that does not convert this case into one challenging implementation rather than design decisions. As the *Whisnant* court recognized, case law generally holds that the government's decisions regarding how and whether to address potential safety hazards involve "the exercise of judgment of the type Congress meant to shield from liability." 400 F. 3d at 1182.[4]

The government has shown that the placement of warning signs around Lake Alpha, the possibility of installing fencing or guardrails, and the possibility of providing grab ropes, buoys, or similar devices all implicate policy issues similar to those recognized in the case law as justifying application of the discretionary function exception. Such safety measures, the evidence reflects, would affect the aesthetics of the course, among other things, and impact the MPGC's mission of providing a recreational environment that best contributes to the retention and well-being of Navy personnel. Accordingly, were plaintiff's claims based solely on her contentions regarding warning signs, fencing, and the like, the discretionary function exception would preclude jurisdiction.

Plaintiff's claim that the government was negligent in failing to construct a "safety shelf" when the Alpha Lake was lined with plastic, however, presents a different issue.[5] No doubt some prior judicial decisions can be read to suggest that design choices *necessarily* and across the board implicate policy matters, and therefore always satisfy the second *Berkovitz* prong. Under that analysis, the Government would be entitled to immunity, for there is no question that the failure to build a safety shelf was just as much a matter of design as the decisions the navy made or failed to

---

[4] Plaintiff also relies heavily on *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), which found jurisdiction where the claim was that the government had failed to warn at all, which is not the case here. Furthermore, the Ninth Circuit has questioned *Summer's* continued force, and has described it as "out of step" with other failure to warn cases. *Terbush*, 516 F. 3d at 1136-37.

[5] Although plaintiff asserts the same claims for relief based on *all* of the aspects of the design she contends were faulty, the court must treat each alleged defect separately because the analysis turns on the nature of the specific alleged conduct. See *Kennewick*, 880 F.2d at 1025 (similarly distinguishing between two alleged errors in design and in construction.)

9

make regarding warning signs and other possible safety measures. Despite broad language in cases such as *Terbush* that "design matters involve discretionary decisions by government actors," such that there is always an "obstacle" to proceeding with such claims, 516 F. 3d at 113, there does not appear to be any case in this circuit directly holding that once a government action is categorized as involving "design," it *automatically* satisfies the second *Berkovitz* prong as being a decision susceptible to social, economic, or political policy analysis.[6] Were there any such *per se* rule, it would collapse the two step analysis mandated by *Berkovitz* anytime a challenged government decision could fairly be characterized as a design decision. The more sound approach, therefore, is to adhere to the two step analysis even where a plaintiff's claim relates to an issue of design, and to evaluate on a case-by-case basis whether the decision (or non-decision) in question can fairly be said to have been susceptible to a public policy analysis.

Focusing on the specific conduct at issue here,[7] the evidence shows that in 2002, the Navy made the decision to clean out Alpha Lake and to install a plastic liner. After the liner was installed, and at the time of Mr. Ventimiglia drowned, the lake was encircled by an exposed strip of the plastic liner, sloping down to the water line. There appears to be no dispute that the liner likely was slick, and particularly slippery if wet.

The government is not precluded from claiming immunity, of course, simply because it is alleged to have affirmatively created a dangerous condition. As noted above, neither is the government required to show that its employees *actually* engaged in a balancing of public policy issues when choosing to create the alleged hazard without including mitigating safety measures.

---

[6] Indeed, as noted above, although the *Whisnant* court endorsed the design/implementation distinction, it also flatly stated that safety decisions *rarely* implicate social, economic, or political policy. Even though other case law makes clear that in the design context safety issues *can* be intertwined with public policy issues, *Whisnant* thus would appear to support the notion that a decision relating to safety should not automatically be presumed also to involve public policy, simply because it arose in a design context.

[7] Whether or not it constituted legal negligence to install the plastic liner in such a fashion given all the circumstances is not relevant to the present motion, but as the *Whisnant* court noted, "the question of *how* the government is alleged to have been negligent is critical."

10

Nevertheless, it *is* incumbent on the government to show how its decision potentially implicated public policy issues. To that end, the Government's primary argument is that it purportedly would cost between $125,000 to $225,000 to re-grade and re-landscape the lake to incorporate a safety shelf, and $25 million to $40 million or more to install such shelves at every water feature in all thirty-six MWR golf courses. This assertion ignores the fact that the question is *not* what it might cost to retrofit Alpha Lake at some point in time after the 2002 renovation, but what incorporating such shelves during that renovation would have entailed. Plaintiff has offered evidence that the cost of incorporating shelves during the renovation would have been less than $2000, a point the government does not address on reply.[8]

The government also suggests, almost in passing, that the installation of safety shelves could have affected the capacity of Alpha Lake, thereby implicating all of the other policy issues attendant to providing a quality golf course. The government has failed to meet its burden, however, to show that this in fact could have been a significant issue subject to policy analysis rather than, as plaintiff suggests, something that could have easily been addressed as part of the grading and renovating project.

In short, while the discretionary function exception precludes the court from "second-guessing" any decisions (or failures to decide) regarding matters touching on public policy, the government has failed to establish how the construction of a safety shelf in Alpha Lake when the liner was installed was a decision susceptible to any political, social, or economic considerations. Rather, the record supports plaintiff's contention that including a safety shelf when the liner was installed was a simple, essentially no-cost safety fix that would not have warranted a careful weighing of options or competing interests. Accordingly, the motion to dismiss must be denied.

---

[8] Even if the government's six-figure cost estimates were valid, that would not necessarily give rise to immunity. See *Kennewick*, 880 F. 2d at 1031 (rejecting argument that increased construction costs alone constituted basis for invoking immunity), *but cf.*, *id*. at 1028 (costs considerations in design phase appropriate basis for immunity).

V. CONCLUSION

The motion of the United States to dismiss the First Amended complaint is DENIED.

IT IS SO ORDERED.

Dated: 9/10/09

RICHARD SEEBORG
UNITED STATES MAGISTRATE JUDGE